[No. S118450. Dec. 20, 2004.]

CITY OF LONG BEACH, Plaintiff and Respondent, v.
DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and Appellant.

## Counsel

John M. Rea, Chief Counsel, Vanessa L. Holton, Acting Chief Counsel, Steven A. McGinty, Assistant Chief Counsel, Sarah L. Cohen, Acting Assistant Chief Counsel, and Anthony Mischel, Staff Counsel, for Defendant and Appellant.

Altshuler, Berzon, Nussbaum, Rubin & Demain, Stephen P. Berzon, Scott A. Kronland, Dorothea K. Langsam and Victor M. Ortiz-de-Montellano for The State Building and Construction Trades Council of California, AFL-CIO as Amicus Curiae on behalf of Defendant and Appellant.

Cox, Castle & Nicholson, John S. Miller, Jr., and Dwayne P. McKenzie for Center for Contract Compliance as Amicus Curiae on behalf of Defendant and Appellant.

Weinberg, Roger & Rosenfeld, Sandra Rae Benson, Ellyn Moscowitz and M. Suzanne Murphy for California Apprenticeship Coordinators Association, et al., as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Andrea Lynn Hoch, Chief Assistant Attorney General, Louis R. Mauro, Assistant Attorney General, and Douglas J. Woods, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Appellant.

Simpson, Garrity & Innes, Paul V. Simpson and Ronald A. Johnstone for Engineering & Utility Contractors Association as Amicus Curiae on behalf of Defendant and Appellant.

Robert E. Shannon, City Attorney, Daniel S. Murphy, Principal Deputy City Attorney, and Michelle Gardner, Deputy City Attorney, for Plaintiff and Respondent.

Rutan & Tucker, M. Katherine Jenson and Mark J. Austin for 44 California Cities and The League of California Cities as Amici Curiae on behalf of Plaintiff and Respondent.

Nick Cammarota for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Atkinson, Andelson, Loya, Ruud & Romo, Robert Fried, Thomas A. Lenz and Alice K. Conway for Associated Builders & Contractors of Southern California, Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

Case, Knowlson, Jordan & Wright, Michael F. Wright and Armen Tamzarian for M&H Realty Partners IV L.P. as Amicus Curiae on behalf of Plaintiff and Respondent.

Stanton, Kay & Watson and James P. Watson for Foundation for Fair Contracting as Amicus Curiae.

Davis, Cowell & Bowe, John J. Davis, Jr., and Andrew J. Kahn for Northern California Mechanical Contractors Association, Los Angeles Chapter National Electrical Contractors Association, Air Conditioning, Refrigeration and Mechanical Contractors Association of Southern California, California Plumbing and Mechanical Contractors Association, California Sheet Metal Contractors National Association and Associated Plumbing and Mechanical Contractors Association as Amici Curiae.

## OPINION

**CHIN, J.**— ■ In this case, we address the application of the state's prevailing wage law (PWL; see Lab. Code, § 1770 et seq.)[1] to private construction of a $10 million animal control facility in Long Beach (the City). The Society for the Prevention of Cruelty to Animals of Los Angeles (SPCA-LA) built the facility, but it was partly funded by a $1.5 million grant from the City that was expressly limited to project development and other *preconstruction* expenses. Section 1771 requires that "workers employed on public works" be paid "not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed . . . ."

When the present contract was executed in 1998, "public works" was defined as including "[c]onstruction, alteration, demolition, or repair work done under contract and *paid for in whole or in part out of public funds* . . . ." (§ 1720, subd. (a), italics added.) As we observe, *after* the agreement was executed, and *after* the City's grant money was used for preconstruction expenses, a 2000 amendment to section 1720, subdivision (a)(1), was adopted to include within the word "construction" such activities as "the design and preconstruction phases of construction," including "inspection and land surveying work," items the City partly funded in this case.

■ We first consider whether the project here is indeed a "public work" within the meaning of section 1771 and former section 1720. We will conclude, contrary to the Court of Appeal, that under the law in effect when the contract at issue was executed, a project that *private* developers build solely with *private* funds on land leased from a public agency remains private. It does not become a *public* work subject to the PWL merely because the City had earlier contributed funds to the owner/lessee to assist in

---

[1] Further statutory references are to this code unless otherwise indicated.

defraying such "preconstruction" costs or expenses as legal fees, insurance premiums, architectural design costs, and project management and surveying fees.

This conclusion completely disposes of this case. We leave open for consideration at another time important questions raised by the parties, including (1) whether, assuming the project indeed was a "public work" under section 1771, it should be deemed a "municipal affair" of a charter city and therefore exempt from PWL requirements, and (2) whether the PWL is a matter of such "statewide concern" that it would override a charter city's interests in conducting its municipal affairs. Resolution of these important issues is unnecessary and inappropriate here because the present project was not a public work subject to the PWL.

## FACTS

The following uncontested facts are largely taken from the Court of Appeal opinion in this case. The Department of Industrial Relations (Department) appeals from a judgment granting a petition for writ of mandate filed by the City. The City had sought to overturn the Department's determination that an animal shelter project financed in part with City funds and built on City lands was subject to the PWL.

In 1998, the City entered into an agreement with SPCA-LA, under which the City agreed to contribute $1.5 million to assist in the development and preconstruction phases of a facility within City limits that would serve as an animal shelter and SPCA-LA's administrative headquarters. It would also provide kennels and office space for the City's animal control department. The agreement required the City's funds to be placed in a segregated account and used only for expenses related to project development, such as SPCA-LA's "investigation and analysis" of the property on which the shelter was to be built, "permit, application, filing and other fees and charges," and "design and related preconstruction costs." SPCA-LA was specifically precluded from using any of the City's funds "to pay overhead, supervision, administrative or other such costs" of the organization.

The City owned the land on which the facility was to be built, but leased it to SPCA-LA for $120 per year. The City in turn agreed to pay SPCA-LA $60 a year as rent for the space occupied by its animal control department. The agreement further provided it was "interdependent," with lease and lease-back agreements between the parties with respect to the City land on which the project would be built. The agreement further stated that "[i]f either the lease or lease-back is terminated then this agreement shall automatically terminate, without notice." Finally, the agreement provided "[i]f there is a

claim relating to the payment of wages arising from the construction described herein," the City shall pay 95 percent of "all costs, expenses, penalties, payments of wages, interest, and other charges related to the claim, including attorneys' fees and court or administrative costs and expenses[.]"

The record shows a portion of the City's financial contribution was spent on such preconstruction expenses as architecture and design ($318,333), project management ($440,524), legal fees ($16,645), surveying ($14,500), and insurance ($23,478). The City estimated that an additional $152,000 in architectural, legal, development and insurance expenses would be required for completion. The dissent observes that some of these additional funds may have been spent after actual construction began. The dissent cites a letter from the City indicating that by the time construction began, some additional funds "had yet to be spent." (Dis. opn., *post*, at p. 958.) The record is unclear, however, if or when such funds were actually paid. But as we previously noted, the City's agreement with SPCA-LA required the City's funds to be used only for project development, design and related preconstruction costs, and the issue before us is whether the term "construction" includes such activities. Assuming some limited City funds were spent *during* construction, the record fails to demonstrate they were used *for* construction.

The project itself was completed in 2001 at a cost of approximately $10 million. Evidence obtained from the SPCA-LA showed the project was intended to serve all of Los Angeles County and parts of Orange County. Animals from all these areas, not just from Long Beach, would be housed at the shelter. In addition, the facility would also house the SPCA-LA's headquarters.

■ Section 1771 states in relevant part: "[N]ot less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed . . . shall be paid to all workers employed on public works." In 1998, when the present contract was executed, "public works" was defined as "[c]*onstruction*, alteration, demolition, or repair work done under contract and paid for in whole or in part out of public funds . . . ." (§ 1720, subd. (a), italics added.) The term "construction" was undefined. As discussed below, a 2000 amendment to section 1720, subdivision (a), adopted several years after the City executed its contract with SPCA-LA and made its limited contribution, now includes within "construction" such activities as "the design and preconstruction phases of construction," including inspection and surveying.

Acting on an inquiry by a labor organization, the Department began an investigation to determine whether the project was a "public work" under former section 1720 and was therefore subject to the prevailing wage rates

that section 1771 mandated. The City argued that the project was not a public work, but even if it was, the prevailing wage law did not apply because it was strictly a charter city's "municipal affair." The Department concluded the project was a public work and the city's status as a charter city did not exempt it from the PWL. This determination was affirmed on an administrative appeal. The City filed a petition for a writ of mandate under Code of Civil Procedure section 1085, challenging the Department's decision that the PWL applied to the shelter project. The trial court granted the writ, and the Department filed a timely appeal. The Court of Appeal reversed, concluding that (1) the project was a public work under former section 1720 and section 1771, (2) the project was not a municipal affair exempt from the PWL, and (3) even if the project was a municipal affair, the PWL was a matter of statewide concern, precluding exemption under the municipal affairs doctrine. Concluding the shelter project was not a public work as then defined, we will reverse the judgment of the Court of Appeal.

## DISCUSSION

■ Before proceeding with our analysis, we set out some established principles that will help guide our decision. In *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976 [4 Cal.Rptr.2d 837, 824 P.2d 643] (*Lusardi*), we spoke regarding the PWL's general intent and scope. We observed that "[t]he Legislature has declared that it is the public policy of California 'to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.' [Citation.] [¶] The overall purpose of the prevailing wage law is to protect and benefit employees *on public works projects*. [Citation.]" (*Lusardi, supra*, 1 Cal.4th at p. 985, italics added.)

*Lusardi* continued by observing that "[t]his general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]" (*Lusardi, supra*, 1 Cal.4th at p. 987.)

■ In conducting our review, we must exercise our independent judgment in resolving whether the project at issue constituted a "public work" within the meaning of the PWL. (*McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1583–1584 [18 Cal.Rptr.2d 680] (*McIntosh*).) We have acknowledged

that the PWL was enacted to protect and benefit workers and the public and is to be liberally construed. (See *Lusardi, supra,* 1 Cal.4th at p. 985.) The law does, however, permit public agencies to form alliances with the private sector and allows them to enter into leases of public lands and to give financial incentives to encourage private, nonprofit construction projects that provide public services at low cost (see Gov. Code, § 26227; *McIntosh, supra,* 14 Cal.App.4th at p. 1587; *International Brotherhood of Electrical Workers v. Board of Harbor Commissioners* (1977) 68 Cal.App.3d 556, 562 [137 Cal.Rptr. 372] [lease to private developer to construct oil and gas facilities and pay city-lessor royalties not "public work" under former section 1720]).

■ "Courts will liberally construe prevailing wage statutes [citations], but they cannot interfere where the Legislature has demonstrated the ability to make its intent clear and chosen not to act [citation]." (*McIntosh, supra,* 14 Cal.4th at p. 1589.) Here, we must determine whether the City's contract with SPCA-LA truly involved "construction" that was paid for in part with public funds.

The City observes that its $1.5 million donation to SPCA-LA was neither earmarked nor used for actual construction of the facility. The City's agreement with SPCA-LA specifically designated the contributed funds for preconstruction costs. Those funds were in fact spent on architectural design, project management, legal fees, surveying fees, and insurance coverage. The City contends that, when the agreement was executed in 1998, "construction" meant only the actual physical act of building the structure.

The City notes that only in 2000, several years *after* the agreement was signed and *after* the City had contributed its funds to the project, did the Legislature amend section 1720, subdivision (a), by adding a sentence stating: "For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work." (Stats. 2000, ch. 881, § 1.) The City views the foregoing amendment as a prospective *change* in the law, not a simple restatement of existing law.

The Department, on the other hand, argues that the term "construction" would encompass the planning, design, and "pre-building" phases of a project, which would include architectural design, project management, and surveying. The City's financial contribution to the project paid for all these items. In the Department's view, the 2000 amendment to section 1720, subdivision (a), merely clarified existing law. As will appear, we think the City's argument makes more sense.

The Court of Appeal observed that the "[Department's] position is supported by the common meaning of the word 'construction' . . . ," citing a dictionary that defines construction as "[t]he act or *process* of constructing." (American Heritage Dict. (2d college ed. 1982) p. 315, italics added; see also *Priest v. Housing Authority* (1969) 275 Cal.App.2d 751, 756 [80 Cal.Rptr. 145] [construction ordinarily includes "the entire process" required in order to erect a structure, including basements, foundations, and utility connections].) But that definition begs the question whether the construction "process" includes the preconstruction activities involved here. Other dictionaries give the word a more literal interpretation.

For example, Webster's Third New International Dictionary (2002), page 489, gives a primary definition of "construction" as "[t]he act of putting parts together to form a complete integrated object." 3 Oxford English Dictionary (2d ed. 1989), page 794, defines the word as "the action of framing, devising, or forming, by the putting together of parts; erection, building." Thus, contrary to the Court of Appeal's statement, dictionary definitions do not strongly support the Department's position.

The Court of Appeal also relied on the Department's own regulations and rulings interpreting and implementing the PWL. It noted that the Department has defined "construction" as including "[f]ield survey work traditionally covered by collective bargaining agreements," when such surveying is "integral to the specific public works project in the design, preconstruction, or construction phase." (Cal. Code Regs., tit. 8, § 16001, subd. (c).) The total project cost was approximately $10 million. The record does not clearly show whether the minimal ($14,500) surveying work paid for out of the City's donation met the "collective bargaining" and "integral work" elements of the Department regulation. Neither the Court of Appeal nor the briefs explore these aspects of the regulation.

In any event, assuming that regulation applies here, although we give the Department's interpretation great weight (e.g., *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042]), this court bears the ultimate responsibility for construing the statute. "When an administrative agency construes a statute in adopting a regulation or formulating a policy, the court will respect the agency interpretation as one of several interpretive tools that may be helpful. In the end, however, '[the court] must . . . independently judge the text of the statute.' " (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322 [87 Cal.Rptr.2d 423, 981 P.2d 52], quoting *Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

■ The Court of Appeal also relied on the Attorney General's opinion citing the Department regulation with apparent approval. (70 Ops.Cal.Atty.Gen. 92, 93–94 (1987).) But the question whether that regulation comported with the PWL was not before the Attorney General, who was asked only whether the PWL applied to engineering firm employees whom the city hired to perform services that the city engineer ordinarily performed. That issue involved determining whether the work was "performed under contract" or "carried out by a public agency with its own forces." (§ 1771.) As the opinion recites, "The inquiry assumes that the work in question is a 'public work' within the meaning" of former section 1720 and section 1771. (70 Ops.Cal.Atty.Gen., *supra*, at p. 93.) Indeed, the Attorney General's conclusion was that the PWL applied to the engineering firm's employees *"except with respect to such duties which do not qualify as a public work." (Id.* at p. 98, italics added.) Thus, the opinion seems inconclusive for our purposes. In any event, as with the Department's own regulations, the Attorney General's opinions are entitled to "considerable weight," but are not binding on us. (E.g., *State of Cal. ex rel. State Lands Com. v. Superior Court* (1995) 11 Cal.4th 50, 71 [44 Cal.Rptr.2d 399, 900 P.2d 648].)

As noted, the City relies in part on the 2000 postagreement amendment to section 1720, subdivision (a), defining "construction" to include work performed during the project's design and preconstruction phases. The City views the amendment as a change in existing law. It relies on an August 30, 2000, letter from the amendment's author, Senator John Burton, seeking to respond to interested parties' "concerns" regarding its operation. The letter recites that the amendment was "intended only to operate prospectively and therefore will only apply to contracts for public works entered into on and after the effective date of the legislation which will be January 1, 2001." (4 Sen. J. (1999–2000 Reg. Sess.) p. 6371.) The present contract was executed in 1998.

Although letters from individual legislators are usually given little weight unless they reflect the Legislature's *collective* intent (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45–46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425–1426 [96 Cal.Rptr.2d 314]), the Burton letter was presented, *prior* to the bill's enactment, to the full Senate, which carried his motion to print it in the Senate Daily Journal. Indeed, the letter is printed and included under the notes to section 1720 in West's Annotated Labor Code. (Historical and Statutory Notes, 44A West's' Ann. Lab. Code (2003 ed.) foll. § 1720, p. 7.) Under these circumstances, we think the letter carries more weight as indicative of probable legislative intent. (See *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 377–378 [20 Cal.Rptr.2d 330, 853 P.2d 496]; *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590–591 [128 Cal.Rptr. 427, 546 P.2d 1371].)

 Moreover, Senator Burton's remarks conform to the well-established rule that legislation is deemed to operate prospectively only, unless a clear contrary intent appears (e.g., *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840–841 [123 Cal.Rptr.2d 40, 50 P.3d 751]; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207–1209 [246 Cal.Rptr. 629, 753 P.2d 585], and cases cited). We find in the available legislative history no indication of an intent to apply the amendment retroactively.

The Department, on the other hand, relies on an Assembly Committee on Labor and Employment report indicating, "The bill [amending section 1720] codifies current Department practice by including inspectors and surveyors among those workers deemed to be employed upon public works and by insuring that workers entitled to prevailing wage during the construction phase of a public works project will get prevailing wage on the design and pre-construction phases of a project." (Assem. Com. on Labor and Employment, Rep. on Sen. Bill No. 1999 (1999–2000 Reg. Sess.) as amended Aug. 18, 2000, p. 3.) This language is inconclusive. Although it indicates the proposed legislation will now adopt the Department *practice* as to inspectors and surveyors, it fails to state that such adoption reflects *existing law* or should be applied retroactively to preexisting contracts. Moreover, the same Assembly Committee report notes that "in its current form, this bill also *expands* the definition of 'public works' to include architects, engineers, general contractors and others in their employ *who have not previously been subject to the prevailing wage laws*." (*Ibid.*, italics added.) This language strongly indicates that the 2000 amendment was more than a simple restatement of existing law.

We also note that the Legislative Counsel's digest to the bill explains that it would "*revise* the definition of public works by providing that 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work." (Legis. Counsel's Dig., Sen. Bill No. 1999 (1999–2000 Reg. Sess.), Stats. 2000, ch. 881, italics added.) The Legislative Counsel also evidently believed that the revision might impose new costs on local government. (*Ibid.*)

 The City observes that the United States Secretary of Labor has defined "construction," for purposes of the *federal* prevailing wage law (40 U.S.C. §§ 3141–3148) as: "All types of work done on a particular building or work at the site thereof . . . by laborers and mechanics employed by a construction contractor or construction subcontractor . . . ." (29 C.F.R. § 5.2(j)(1) (2004).) "Laborers and mechanics" generally include "those workers whose duties are manual or physical in nature (including those workers who use tools or who are performing the work of a trade), as distinguished

from mental or managerial." (29 C.F.R. § 5.2(m) (2004).) This definition seemingly would not cover work done by surveyors, lawyers, project managers, or insurance underwriters, who function before actual construction activities commence.

We have found no case deciding whether surveyors' work constitutes "construction" under federal regulations. California's prevailing wage law is similar to the federal act and shares its purposes. (*Southern Cal. Lab. Management etc. Committee v. Aubry* (1997) 54 Cal.App.4th 873, 882 [63 Cal.Rptr.2d 106].) Although the Legislature was free to adopt a broader definition of "construction" for projects that state law covers, certainly the fact that federal law generally confines its prevailing wage law to situations involving actual construction activity is entitled to some weight in construing the pre-2000 version of the statute.

The Court of Appeal concluded that the broader interpretation of "construction" in former section 1720, subdivision (a), is "most consistent" with the PWL's purpose, to protect employees and the public. But, of course, no one suggests that had SPCA-LA, a private charitable foundation, funded the entire project, the PWL, which applies only to projects constructed in whole or in part with *public funds*, would nonetheless cover it. Does it make a difference that SPCA-LA received City funds for designing, surveying and insuring, and otherwise managing the project at the preconstruction phase? For all the reasons discussed above, we conclude the project falls outside the PWL's scope. Our conclusion makes it unnecessary to reach the City's alternative contention that the present project was not "done under contract" within the PWL's meaning. (See § 1720, subd. (a).)

## CONCLUSION

The PWL does not apply in this case because no publicly funded construction was involved. The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Dissenting.—When a construction project is funded in whole or in part by a public entity, California law requires that the workers be paid the local prevailing wage. Here, a city and a charity entered into a contract for construction of a building, and agreed that the city would pay for certain expenses essential to the overall project but would not pay for erection of the building itself. The majority concludes the project was not a public work and therefore not subject to the prevailing wage. I disagree.

# I

In 1998, the City of Long Beach (City) contracted with the Society for the Prevention of Cruelty to Animals, Los Angeles (SPCA-LA) for the latter to construct a building that was to contain an animal shelter as well as the SPCA-LA's headquarters and the City's animal control department. The City agreed to contribute $1.5 million to the project (which ultimately cost approximately $10 million) and to lease to the SPCA-LA, at a nominal fee, the six and one-half acres of land on which the facility was to be built.

In December 1999, just after ground was broken and the actual building had begun, a local newspaper reported on the project. This prompted a labor organization to ask the state Department of Industrial Relations (DIR) to investigate whether the project was a public work and therefore subject to the prevailing wage law. In response to the DIR's inquiry, the City explained in a letter written in September 2000 that the SPCA-LA had placed the City's $1.5 million contribution in a segregated account; that roughly $1 million was being used to pay the architects, project managers, lawyers, and surveyors, as well as the insurance costs; the rest would be used for advertising, fundraising, and "startup costs" such as furniture and equipment; and that none of the City's money would be used to pay for the building itself. The City asserted that because its financial contribution would not be used to pay for the building itself, the project was not a public work. The DIR, however, determined that the project was a public work and therefore subject to the prevailing wage law; that ruling was affirmed on administrative appeal. The City challenged that decision in a petition for writ of mandate in the superior court. The court granted the writ, and the DIR appealed. The Court of Appeal reversed the superior court, concluding that the project was a public work.

# II

Labor Code section 1771[1] provides that "all workers employed on public works" costing more than $1,000 must be paid "the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed . . . ." When the City and the SPCA-LA contracted to build the animal control facility in question, the version of section 1720, subdivision (a) (former section 1720(a)) then in effect defined "public works" in these words: "*Construction*, alteration, demolition, or repair work done under contract and *paid for in whole or in part out of public funds* . . . ." (Stats. 1989, ch. 278, § 1, p. 1359, italics added.) At issue here is what the Legislature meant by the term "construction." That term, which has been in section 1720 since its enactment in 1937, is ambiguous. In a narrow sense it

---

[1] All further statutory citations are to the Labor Code.

could mean—as the majority concludes—erection of the actual building only. In a broader sense it could mean—as the Court of Appeal concluded—the entire construction project, including the architectural, project management, insurance, surveying, and legal costs paid for by the City here. The parties furnish no legislative history bearing on the intent of the Legislature in 1937, when it used the word "construction" in former section 1720(a). But two principles of statutory interpretation provide guidance, as discussed below.

In construing an ambiguous statute, courts generally defer to the views of an agency charged with administering the statute. "While taking ultimate responsibility for the construction of a statute, we accord 'great weight and respect to the administrative construction' thereof. . . . [¶] Deference to administrative interpretations always is 'situational' and depends on 'a complex of factors' . . . , but where the agency has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to correspondingly greater weight . . . ." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436 [2 Cal.Rptr.3d 699, 73 P.3d 554], citations & fn. omitted (*Sharon S.*); see also *Styne v. Stevens* (2001) 26 Cal.4th 42, 53 [109 Cal.Rptr.2d 14, 26 P.3d 343]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

The Legislature has given the Director of the DIR "plenary authority to promulgate rules to enforce the Labor Code," including "the authority to make regulations governing coverage" under the prevailing wage law. (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 989 [4 Cal.Rptr.2d 837, 824 P.2d 643].) When, as here, the meaning of a statutory term is ambiguous and there is no indication of the Legislature's intent regarding its meaning, this court should defer to the DIR's determination based on its "special expertise" (*Sharon S., supra*, 31 Cal.4th at p. 436), so long as that determination was "carefully considered by senior agency officials" (*ibid.*) and is consistent with the DIR's previous decisions (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 13 [courts should not defer to an administrative agency that has taken a "vacillating position" as to the meaning of the statute in question]).

Here, in a 13-page decision signed by DIR Director Stephen Smith, the DIR concluded that this project was a public work. The DIR's regulations have long stated that surveying work, which the City paid for here, comes within the definition of the term "construction" under former section 1720(a), whether or not it occurs before the actual building process begins, so long as it is "integral to" the project. (Cal. Code Regs., tit. 8, § 16001, subd. (c).) The City does not deny that the work performed by the architect and the project manager—also paid for by the City—was integral to the construction project here. Thus, the DIR's determination that the construction project in question

is a public work was carefully considered by a senior agency official and is consistent with the agency's regulations. Therefore, that decision commands great deference.

Also lending support to my conclusion is California's long-standing policy that prevailing wage laws are to be liberally construed in favor of the worker. (*Walker v. County of Los Angeles* (1961) 55 Cal.2d 626, 634–635 [12 Cal.Rptr. 671, 361 P.2d 247]; *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1589 [18 Cal.Rptr.2d 680]; *Union of American Physicians v. Civil Service Com.* (1982) 129 Cal.App.3d 392, 395 [181 Cal.Rptr. 93]; *Melendres v. City of Los Angeles* (1974) 40 Cal.App.3d 718, 728 [115 Cal.Rptr. 409]; *Alameda County Employees' Assn. v. County of Alameda* (1973) 30 Cal.App.3d 518, 531 [106 Cal.Rptr. 441].) When, as here, a term in the prevailing wage law can plausibly be construed in two ways, one broad and one narrow, and there is no evidence that the Legislature intended the term's narrow meaning, this court should adopt the term's broader meaning. The Legislature's objectives in enacting the prevailing wage law were these: "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi Construction Co. v. Aubry, supra,* 1 Cal.4th at p. 987.) These purposes will be implemented by applying the prevailing wage law to the project here.

For the reasons given above, the word "construction" in former section 1720(a) refers to work that, in the Court of Appeal's words, is "integrally connected to the actual building and without which the structure could not be built." That includes the costs of surveying, architectural design and supervision, and project management paid for by the City here.

### III

The majority acknowledges the two rules of statutory interpretation I just discussed. As applied here, those rules require a broad reading of the word "construction" in former section 1720(a). Yet the majority construes the term narrowly, holding that it does not encompass the expenses paid for by the City here. The majority's reasons are unpersuasive.

The majority repeatedly characterizes as "preconstruction" costs the expenses the City paid for architectural design and supervision, project management, insurance, surveying, and legal services. (Maj. opn., *ante,* at pp. 946, 947, 950, 951, 954.) To label these expenses as "preconstruction" is

misleading. The term implies that all these expenses were incurred *before* the building of the facility began. But, as explained below, that view finds no support in the record.

True, the *surveying* expenses were most likely incurred at the outset of the project, as is customarily the case. But that is not true of the project's management and architectural costs. The SPCA-LA's contract with project manager Pacific Development Services said the latter's duties included "Construction Management of *all phases of construction of the Project.*" (Italics added.) And the SPCA-LA's contract with the architectural firm of Warren Freedenfeld & Associates provided that the firm would "be a representative of and shall advise and consult with the owner *during construction*," would "visit the site at intervals appropriate to the stage of construction," would "keep the Owner informed of the progress and quality of the Work," and would attempt to "guard the Owner against defects and deficiencies in the Work" as it progressed. (Italics added.) Indeed, the City's September 2000 letter to the DIR (see p. 955, *ante*) when the building phase of the project was well under way, said that of the approximately $540,000 of the City's contribution that was budgeted for project management, $100,000 had yet to be spent; and that of the $360,000 of the City's contribution that was budgeted for architectural fees, $40,000 had yet to be spent. The City's letter also mentioned that smaller portions of the legal and insurance costs had yet to be paid. Thus, the contracts with the project manager and the architect, as well as the City's letter, demonstrate that the City did not pay merely for "preconstruction" costs but also for expenses incurred while the facility was being constructed.

The majority talks at length about an amendment to section 1720(a) that the Legislature enacted in 2000, stating that the term "construction," as used in that section, includes "the design and preconstruction phases of construction." After a thorough review of the legislative history pertaining to the 2000 amendment, the majority concludes that the Legislature did not intend the amendment to apply retroactively. Right. So what? Retroactivity of the 2000 amendment is not at issue here; therefore, the intent of the 2000 Legislature has no bearing here. What is at issue is the intent of the Legislature back in 1937, when it first used the word "construction" to define public works in former section 1720(a). It is the duty of this court, not the 2000 Legislature, to determine the 1937 Legislature's intent, and the views of the 2000 Legislature on the subject are not controlling. As this court said less than two months ago: "[T]he 'Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative

authority simply to say what it *did* mean.' " (*McClung v. Employment Development Department* (2004) 34 Cal.4th 467, 473 [20 Cal.Rptr.3d 428, 99 P.3d 1015].)

## IV

I would uphold the Court of Appeal's decision that the project here was a public work and thus subject to the prevailing wage law. The majority concludes to the contrary and sees no need to resolve the remaining two issues on which this court granted review: (1) whether the project is a "municipal affair" exempt from the prevailing wage law, and (2) whether the prevailing wage law is a matter of statewide concern that overrides the municipal affair exemption. These are difficult and important questions. I would retain the case to decide them.