[Nos. A107763, A107769. First Dist., Div. Two. Nov. 22, 2005.]

GREYSTONE HOMES, INC., Plaintiff and Appellant, v.
CHUCK CAKE, as Acting Director, etc., et al., Defendants and
Respondents;
PLEASANT HILL REDEVELOPMENT AGENCY, Defendant and
Appellant.

**2**

## COUNSEL

Morrison & Foerster and Andrew Biel Sabey for Plaintiff and Appellant.

Cook Brown and Dennis B. Cook for Beutler Corporation as Amicus Curiae on behalf of Plaintiff and Appellant.

Richards Watson & Gershon and Juliet Elizabeth Cox for Defendant and Appellant.

Goldfarb & Lipman and Lynn Hutchins for The California Redevelopment Association as Amicus Curiae on behalf of Defendant and Appellant.

Christopher W. Frick for Defendant and Respondent Chuck Cake.

Davis, Cowell & Bowe and John J. Davis for Defendant and Respondent Trico Pipes.

Davis Cowell & Bowe and Lisa Win-Ning Pau for Defendant and Respondent Plumbers and Steamfitters Local Union.

Altshuler, Berzon, Nussbaum, Rubin & Demain and Scott A. Kronland for Defendant and Respondent IBEW Local Union No. 302.

Weinberg Roger & Rosenfeld and Sandra Rae Benson for Defendant and Respondent Carpenters Local Union No. 152.

OPINION

HAERLE, J.—

## I. INTRODUCTION

The question presented by this appeal is whether a project to build a housing development in Pleasant Hill constituted a public work subject to California's prevailing wage law (PWL).[1] Both the Department of Industrial Relations (DIR) and the lower court found that the project was a public work. The developer, Greystone Homes, Inc. (Greystone), and the Pleasant Hill Redevelopment Agency (the Agency) disagree and have filed separate appeals from a judgment denying Greystone's petition for writ of mandate.

This court consolidated the two appeals. Respondents are the DIR, the acting director of the DIR at the relevant time, Chuck Cake (the Director), and four labor organizations who obtained the public work determination from the Director in this case (the Union respondents). We hold that the project at issue was not a public work and, therefore, reverse the judgment.

## II. STATEMENT OF FACTS

A. *The Redevelopment Project*

The Agency solicited proposals from interested parties to redevelop the "Cleaveland Triangle" area in Pleasant Hill, a 7.5-acre site consisting of 29

---

[1] "The overall purpose of the [PWL] . . . is to benefit and protect employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]" (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)

separate parcels of property. Redeveloping this site, located within the "Schoolyard Redevelopment Project Area," was part of the Agency's general plan to use its financial resources and administrative powers to stimulate private development and help improve the economic base of the project area and community.

On September 22, 1998, the Agency entered into an "Exclusive Right to Negotiate Agreement" with the DeSilva Group (DeSilva) to develop a plan for the Cleaveland Triangle project (the Project). Negotiations culminated in a "Disposition and Development Agreement" (DDA). Before the DDA was executed, a public hearing was held and the Agency obtained approval from the Pleasant Hill City Counsel to proceed with the Project by entering into the DDA. As part of the approval process, the Agency filed a "Summary Report," which outlined the plan for the Project and the respective obligations of the Agency and the Developer.

In November 1999, the Agency and DeSilva executed the DDA. In December 1999, DeSilva assigned its rights and responsibilities under the DDA to Greystone.

The plan for this Project was to aggregate the 29 separate parcels into a common ownership, and then to build 134 residential townhomes, parking and swimming facilities, and on- and off-site improvements. Twelve of the townhomes would be made "available for sale at an affordable housing cost to moderate-income persons." These units were to be subject to affordability covenants restricting for several years both the prices for which they could be sold and resold and the income level of eligible buyers.

B. *Aggregation of the 29 Parcels*

At the time the DDA was executed, DeSilva owned or was under contract to purchase 20 of the 29 parcels in the Cleaveland Triangle area (the Developer Parcels). Two parcels were owned by the Agency (the Existing Agency Parcels), and the seven remaining parcels were owned by third parties (the Acquisition Parcels). Pursuant to the DDA, the Agency agreed to convey to the Developer the two Existing Agency Parcels and any Acquisition Parcels that it subsequently acquired.

The Agency had used public funds to purchase one of the Existing Agency Parcels, the "Clara Court Parcel," for $161,111.11. The second Existing Agency Parcel, the "District Parcel," was purchased by the Agency with funds advanced to it by DeSilva.

The DDA required the Agency to obtain appraisals of the Acquisition Parcels, to advise the Developer of the appraised values of the parcels, and to attempt to purchase the parcels at the Developer's request. The Agency also agreed to consider using its eminent domain power if it was unable to acquire the Acquisition Parcels by negotiation within a given time period. The Developer was required to advance funds to pay preacquisition and acquisition costs incurred by the Agency to purchase these parcels.

## C.  *Financing*

The estimated cost of the Project was $31.3 million. The financing obligations for the Project were set forth in an attachment to the DDA entitled "Method of Financing" (hereafter, the financing attachment).

The financing attachment provided that the Developer was required to pay "all costs for demolishing any buildings or other improvements on the Site and clearing and preparing the Site for development," and "all hard and soft costs of construction of the Developer Improvements, including without limitation, the Off-site Improvements." The Developer was also required to pay the costs of complying with the conditions of approval of the tentative map for the Project.

The Summary Report the Agency had filed prior to executing the DDA stated the Agency had committed to pay a "Traffic Impact Mitigation Fee," which was estimated to be approximately $209,000. Neither the financing attachment nor any other provision of the DDA made any reference to this Traffic Impact Mitigation Fee.

The financing attachment obligated the Agency to reimburse the Developer in the future for payments the Developer made or would make in order to acquire the 29 parcels needed for the Project. Specifically, the Agency agreed to reimburse the Developer for (1) advances to the Agency for preacquisition and acquisition costs relating to the purchase of the Acquisition Parcels; (2) acquisition costs that the Developer incurred in order to purchase the

Developer Parcels; and (3) funds advanced to the Agency before the DDA was executed to purchase the District Parcel, one of the two Existing Agency Parcels.

Reimbursement for these costs was to be paid by the Agency out of future revenue generated by the Project as a result of increased property taxes.[2] The DDA provided that the maximum reimbursement the Agency could make to the Developer was $2,507,000, of which $2,267,000 could be paid out of increases in unrestricted property tax revenue attributable to the Project (referred to in the financing attachment as "Annual Net Tax Increments"), and $240,000 could be paid from increases in property tax revenue attributable to the Project but restricted to use for affordable housing projects (referred to in the financing attachment as "Annual Housing Set-aside Revenue").[3]

D.  *The Public Works Determinations*

■  With exceptions not relevant here, the PWL requires that "all workers employed on public works" must be paid "not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed." (Lab. Code, § 1771.) The general prevailing rate of per diem wages is determined by the Director of the DIR. (Lab. Code, § 1770.)

When the DDA was executed, "public works" was defined as "[c]onstruction, alteration, demolition, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority." (Former Lab. Code, § 1720, subd. (a) (former section

---

[2] Pursuant to the California Redevelopment Law, Health and Safety Code section 33000 et seq. (the CRL), "tax revenues available for local agencies from land within the boundaries of a redevelopment plan are frozen as of the date the plan is adopted and any tax revenues generated by an increase in property values after adoption of the plan (the tax increment) are paid exclusively to the local redevelopment agency to pay the principal and interest on any indebtedness incurred by the agency to finance the redevelopment project." (*Lancaster Redevelopment Agency v. Dibley* (1993) 20 Cal.App.4th 1656, 1658, fn. 2 [25 Cal.Rptr.2d 593]; see also Health & Saf. Code, § 33670.)

[3] The CRL requires that at least 20 percent of the tax increment allocated to an agency pursuant to section 33670 must be used to increase, improve and preserve the community's supply of affordable housing. (Health & Saf. Code, § 33334.2.) This requirement furthers a "fundamental goal" of the CRL, to increase the supply of low- and moderate-income housing. (*Lancaster Redevelopment Agency v. Dibley, supra,* 20 Cal.App.4th at p. 1658.)

1720(a)).) The parties agree that this case is governed by former section 1720(a).[4]

By letter dated June 27, 2002, the Union respondents requested a determination from the DIR that the Project was a public work. On January 16, 2003, the Director issued Public Works Coverage Determination No. 2002-053. The Director determined that the Project "is a public work subject to the payment of prevailing wages."

The Director found that the Project was demolition and construction, done under contract and paid for in part with public funds from the Agency. He identified three distinct payments of public funds. First, the Director characterized the conveyance of the Clara Court Parcel to the Developer as a "gift of public land" which was the "equivalent of the payment of public funds." Second, the Director found that the Agency's payment of the Traffic Impact Mitigation Fee, referenced in the Agency's Summary Report, was a "payment for construction since the impact fees are a mandatory cost of constructing the Project." Finally, the Director found that the "Agency's payment of the annual net tax increments and housing set-aside funds constitutes payment of public funds for construction since they are being paid to reimburse the Developer's costs." The Director reasoned that each of these three payments was for "activities integrally connected to the construction of the Project," thus making the Project a public work.

Greystone appealed the Director's decision on February 25, 2003. On July 10, 2003, the Director affirmed his determination that the Project was a public work. On September 4, 2003, Greystone filed a petition for a peremptory writ of mandate and complaint for declaratory relief. The trial court denied the writ. Although it affirmed the Director's determination that the Project was a public work, the court based its decision solely upon the $240,000 reimbursement the Agency paid from Annual Housing Set-aside Revenue.

The trial court concluded that the Agency's payment of $240,000 as "an incentive to sell 12 homes at below market rates" established that the project was " 'paid for in whole or in part out of public funds.' " (Former § 1720(a).) The court rejected appellants' argument that this payment did not make the Project a public work because a contribution toward acquisition of real

---

[4] A 2000 amendment to section 1720(a)(1) added the following sentence: "For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work." This provision was amended again in 2001 to add the term "installation" to the list of activities constituting public works. (See generally, current Lab. Code, § 1720, subd. (a)(1).)

property does not constitute payment for "construction" within the meaning of former section 1720(a). According to the trial court, "[t]his payment was neither earmarked as a payment for land acquisition nor proven to in fact be used solely for land acquisition. Since money is fungible, it is the view of this court that to be treated as solely land acquisition monies one or the other is necessary."

A judgment denying the petition for writ of mandate was filed July 6, 2004.

## III. DISCUSSION

### A. *Issue Presented and Standard of Review*

Appellants contend the trial court erred by affirming the Director's determination that the Project was a public work within the meaning of former section 1720(a). Because we agree, we do not reach appellants' alternative arguments that (1) the Director violated the Administrative Adjudication Bill of Rights and the Administrative Procedure Act and (2) equitable considerations preclude enforcing the Director's determination.

The DIR maintains that this court must affirm the Director's factual findings that public funds were used to pay for construction of the Project because they are supported by substantial evidence. In fact, though, the Director expressly based his determination on legal rather than factual grounds. In denying Greystone's request for a hearing before the DIR, the Director stated: "Because here the material facts are undisputed and the issues raised are legal ones, there are no factual issues to be decided and no hearing is necessary."

In any event, the DIR fails to identify the correct standard of review. "In conducting our review, we must exercise our independent judgment in resolving whether the project at issue constituted a 'public work' within the meaning of the PWL." (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949 [22 Cal.Rptr.3d 518, 102 P.3d 904] (*City of Long Beach*); see also *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1583–1584 [18 Cal.Rptr.2d 680] ["public-works coverage determinations, because they entail interpretations of section 1720, cannot be shielded from mandate review by labeling them discretionary: 'Interpretation or construction of a statute is a matter of law; not the exercise of discretionary authority' "].)

B.  *City of Long Beach*

Former section 1720(a), which defines "public work" for purposes of this case, was recently interpreted by our Supreme Court in *City of Long Beach, supra*, 34 Cal.4th 942. The project at issue there was the private construction of a $10 million animal control facility built by the Society for the Prevention of Cruelty to Animals (SPCA) and funded in part by a $1.5 million grant from the City of Long Beach (City). (*Id.* at p. 946.) Use of the grant money was expressly limited to project development and other preconstruction expenses. (*Ibid.*) The Director determined that the SPCA project was a public work under former section 1720(a) and the Court of Appeal agreed. The *City of Long Beach* court reversed.

In reaching its decision, the *City of Long Beach* court resolved a dispute regarding the meaning of the term "construction" in former section 1720(a). (*City of Long Beach, supra*, 34 Cal.4th at p. 950.) The City argued "construction" meant "only the actual physical act of building the structure." (*Ibid.*) It maintained that this narrow definition was expanded by a 2000 amendment to section 1720(a) which expressly defined "construction" to include " 'work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work.' " (34 Cal.4th at p. 950; see fn. 4, *ante.*) The City characterized this 2000 amendment as a "prospective *change* in the law, not a simple restatement of existing law" which did not apply retroactively to agreements that were executed prior to its effective date. (*City of Long Beach, supra,* 34 Cal.4th at p. 950.) On the other hand, the DIR maintained that the term "construction" encompassed "the planning, design, and 'pre-building' phases of a project, which would include architectural design, project management, and surveying." According to the DIR, the 2000 amendment to section 1720(a) merely clarified existing law. (34 Cal.4th at p. 950.)

The *City of Long Beach* court agreed with the City. (*City of Long Beach, supra*, 34 Cal.4th at p. 950.) It found that (1) the term "construction" in former section 1720(a) did not encompass work performed during a project's design and preconstruction phases, (2) the 2000 amendment to section 1720(a) expanded the definition of "public works," and (3) the amendment did not apply retroactively to contracts executed prior to its effective date. (34 Cal.4th at pp. 951–955.) Therefore, the court held that the SPCA project, which was built solely with private funds, did not become a public work under former section 1720(a) because the City had contributed funds to

defray such " 'preconstruction' costs or expenses as legal fees, insurance premiums, architectural design costs, and project management and surveying fees." (34 Cal.4th at p. 947.)

In the present case, both the Director and the trial court issued their decisions before *City of Long Beach* was decided. The Director made the legal determination that payment for construction under former section 1720(a) meant a payment for any activity essential to the completion of a construction project. Thus, he found this Project was a public work because Agency contributions funded "activities integrally connected to the construction of the Project . . . ." This interpretation and application of the governing statute is erroneous under *City of Long Beach*. The *City of Long Beach* court was persuaded that the term "construction" in former section 1720(a) "meant only the actual physical act of building the structure," and it expressly rejected the DIR's contrary claim that this term encompassed "pre-building" phases of a project. (*City of Long Beach, supra*, 34 Cal.4th at p. 950.)

Apparently the trial court in the present case was persuaded by the Director's overly-broad construction of former section 1720(a). The court found that the Agency's payment of "$240,000 as an incentive to sell 12 homes at below market rates" established that "the *project* was 'paid for in whole or in part out of public funds.' " (Italics added.) To the extent it equated "project" costs with "construction" costs, the trial court erred. In light of *City of Long Beach*, the dispositive question in the present case is whether *actual construction* of the new development at the Cleaveland Triangle site in Pleasant Hill was paid for in whole or in part out of public funds. (See *City of Long Beach, supra*, 34 Cal.4th at pp. 946, 950–951.)

Respondents characterize *City of Long Beach* as a narrow ruling which is inapposite because it is factually distinguishable. *City of Long Beach* is narrow in the sense that it interprets former section 1720(a), a statute which governs a limited number of cases. However, since it is undisputed that this case is governed by former section 1720(a), *City of Long Beach* is directly on point and it streamlines our analysis in this case. Accordingly, we summarily reject the numerous arguments that respondents make which simply ignore the *City of Long Beach* Court's interpretation of former section 1720(a).[5]

---

[5] Although we reject respondents' efforts to restrict *City of Long Beach* to its facts, we acknowledge the limited impact of our decision in this case. In October 1998, the Agency adopted its own prevailing wage policy which was intended to be more expansive than the PWL. However, the Project at issue in this case was exempted from the Agency's new policy.

## C. *The Project in This Case*

As detailed in our factual summary, the Agency made three distinct contributions to the Project: (1) the conveyance of the Clara Court parcel (the parcel conveyance); (2) payment of the traffic mitigation fee (the fee payment); and (3) reimbursement for property acquisition costs paid out of future tax revenues (the Agency reimbursement).

The parties spend considerable time debating two irrelevant factual issues: (1) whether the parcel conveyance was a "gift" of public land and (2) whether there is sufficient evidence in the record that the fee payment was actually made by the Agency. We need not resolve these issues because, in any event, neither payment constitutes a payment for actual construction which would make this Project a public work under *City of Long Beach.* The real property involved in the parcel conveyance became part of the land upon which the Project was built; it was not used to pay the costs of construction. Nor was the traffic mitigation fee a cost of actual construction. According to the DIR such a fee "alleviate[s] the impact of the increase in traffic resulting from the construction of town homes." (Citing *Lancaster Redevelopment Agency v. Dibley, supra,* 20 Cal.App.4th at p. 1659.) Thus the fee was incurred as a consequence of the construction and paying it did not constitute a payment for actual construction.

We also find that the Agency reimbursement was not used to pay for actual construction of the Project in this case. The Agency's express obligation was to reimburse the Developer for the costs of acquiring the land needed for the Project out of future tax revenues generated by the Project. Since public funds were used to pay for land acquisition rather than construction costs, the Agency reimbursement did not make this Project a public work under former section 1720(a). (See *City of Long Beach, supra,* 34 Cal.4th 942.)

Respondents argue that the Agency reimbursement came from two distinct sources, the Annual Housing Set-aside Revenue and the Annual Net Tax Increment revenue, and that only payments from the Annual Net Tax Increment revenue were used to pay for land acquisition costs. According to respondents, the $240,000 paid from Annual Housing Set-aside Revenue was used to reimburse the Developer for the costs of constructing the low-cost housing units.

Initially, we note that the entire Agency reimbursement was paid from the same source, future tax revenues generated by the project. Annual Housing Set-aside Revenue was simply 20 percent of the total Annual Net Tax Increment

revenue attributable to the Project. The Annual Housing Set-aside Revenue was identified separately in the DDA in order to ensure compliance with Health and Safety Code § 33334.2, which required that 20 percent of the total annual tax increments the Agency received from the site were used for low- and moderate-income housing. (See fns. 2 & 3, *ante*.)

That said, the real problem with respondents' argument is that the distinction between Annual Net Tax Increment revenue and Annual Housing Set-aside Revenue has no bearing whatsoever on the intended destination of the public funds that the Agency contributed to this project. The DDA unequivocally provided that both the Annual Housing Set-aside Revenue and the Annual Net Tax Increment revenue were promised to the Developer in order to satisfy a single Agency obligation—to reimburse the Developer for the costs of acquiring the 29 parcels comprising the Cleaveland Triangle Site. Neither revenue went to pay for "construction" costs.

Respondents rely on evidence indicating that the purpose of the $240,000 payment from the Annual Housing Set-aside Revenue was to offset the Developer's costs in building the affordable housing units. For example, the DDA states that the Agency pledges to pay "the Annual Housing Set-aside Revenue from the Site for the purpose of reimbursing the developer for the costs of providing affordable moderate-income housing on the Site." Evidently, the trial court was persuaded by this type of evidence. It characterized the reimbursement from Annual Housing Set-aside Revenue as "incentive monies" for low-cost housing and found that this payment constituted payment for construction under former section 1720(a).

But respondents incorrectly focus on the Agency's motivation for entering into the DDA. Unquestionably, the payment from Annual Housing Set-aside Revenue was "incentive" money promised to the Developer in exchange for the promise to construct and maintain low-cost housing units as part of the Project. However, the *motivation* behind a payment of public funds is simply not determinative of whether the funds paid for *actual construction*. Here, the DDA provided that the Agency would reimburse the Developer for land acquisition costs, not for construction costs. The motivation which resulted in this Agency commitment does not alter that fact.

Respondents also place considerable reliance on the trial court's conclusion that the $240,000 Agency reimbursement for Annual Housing Set-aside Revenue was not a contribution to land acquisition because it was not "earmarked as a payment for land acquisition." But, as best we can determine, this conclusion rested on the faulty premise that the Annual Housing

Set-aside Revenue was a payment distinct from the Annual Net Tax Increment revenue. As we have explained, *all* of the future tax revenue from the Project that the Agency committed to use to reimburse the Developer (be it the Annual Housing Set-aside Revenue or the Annual Net Tax Increment revenue) was earmarked as a payment for land acquisition. The DDA expressly obligated the Agency to reimburse the Developer for costs incurred in order to acquire the 29 parcels. The Agency had no obligation to pay for or reimburse the Developer for any other costs.

As noted in our factual summary, the trial court reasoned that, because money is fungible, public funds can be treated as "solely land acquisition monies" only if the payment in question was earmarked as a payment for land acquisition or if it is "proven to in fact be used solely for land acquisition." We acknowledge but do not resolve the parties' disagreement about the soundness of this reasoning.[6] Even under the trial court's test, the Agency reimbursement was money used for land acquisition because it was earmarked as a payment for land acquisition costs.

Further, without challenging the trial court's legal analysis, we do question whether it could properly have based its determination in this particular case on a perceived failure of proof as to how the $240,000 reimbursed from Annual Housing Set-aside Revenue was actually used by the Developer. In proceedings before the DIR, the Director repeatedly characterized the Agency reimbursement as a payment for the costs of land acquisition and never questioned whether the money was used for that purpose. Indeed, as noted earlier, Greystone was denied a hearing before the Director for the very reason that, according to him, there were no disputed factual issues.

■ To summarize, the Director's determination that the Project was a public work was based on an erroneous application of former section 1720(a). The trial court erred by affirming that determination. *City of Long Beach* establishes that the use of Agency funds to reimburse the Developer for land acquisition costs of the Project did not constitute payment for "construction" under former section 1720(a). Since the Developer paid all demolition and construction costs with private funds, the Project was not a public work.

---

[6] Appellants maintain that the DIR has the burden of proving that public funds were used to pay for construction while respondents counter that the burden should be on the parties involved in the project. Respondents underscore that imposing such a burden on the DIR would essentially preclude the Director from ever finding that a project constitutes a public work. Both sides find support for their positions in *City of Long Beach*, but that case does not directly address this issue.

## IV. DISPOSITION

The judgment is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to appellants.

Kline, P. J., and Ruvolo, J., concurred.