[No. B219504. Second Dist., Div. Two. Mar. 24, 2011.]

OXBOW CARBON & MINERALS, LLC, Plaintiff and Appellant, v. DEPARTMENT OF INDUSTRIAL RELATIONS et al., Defendants and Respondents;
IRON WORKERS UNION LOCAL NO. 433 et al., Real Parties in Interest and Respondents.

540

**COUNSEL**

Seyfarth Shaw, Robert Tollen and Ann H. Qushair for Plaintiff and Appellant.

Vanessa L. Holton, Anthony Mischel and Harold L. Jackson for Defendants and Respondents.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld and Roberta D. Perkins for Real Party in Interest and Respondent Iron Workers Union Local No. 433.

Gibbs, Giden, Locher, Turner & Senet, Barbara R. Gadbois and Gary E. Scalabrini for Real Party in Interest and Respondent City of Long Beach.

**OPINION**

**BOREN, P. J.**—Oxbow Carbon & Minerals, LLC, appeals from a judgment denying its petition for writ of mandate. The petition for writ of mandate followed an adverse administrative ruling by respondents State of California, Department of Industrial Relations (Department or DIR), and its director, John C. Duncan (Director). The Director found that work performed under two separate contracts constituted "public works" pursuant to Labor Code section 1720 because the work was paid for in part out of public funds, and it was therefore subject to California's prevailing wage law.[1] The trial court agreed. We affirm.

---

[1] Further statutory references are to the Labor Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

The subject of this appeal is a building at Pier G, Pad 14 (Pad 14) in the City of Long Beach, which appellant Oxbow Carbon & Minerals, LLC (Oxbow), uses pursuant to a lease agreement with real party in interest City of Long Beach (Long Beach). Oxbow's involvement with Pad 14 began after its purchase in 2003 of Applied Industrial Materials Corporation (AIMCOR), a company which, like Oxbow, was in the business of buying and selling petroleum coke, a by-product of the oil refining process.

AIMCOR originally leased Pad 14 from Long Beach in 1974. For a time, AIMCOR used the premises to receive petroleum coke by truck and store it until it could be loaded onto oceangoing vessels.

In 1990, AIMCOR entered into a new lease with Long Beach, pursuant to which AIMCOR constructed a four-wall structure that was open at the top (i.e., roofless), and various other implements. The purpose of these improvements was for the storage and conveyance of petroleum coke, which was delivered by truck to a location outside the structure. Coke would be lifted up by a stacker and dumped into the structure from overhead. After sitting in storage, it was conveyed from the floor of the structure to available ships.

In 1999, the South Coast Air Quality Management District amended its rule 1158 (Storage, Handling, and Transport of Coke, Coal and Sulfur) (hereinafter, rule 1158). The amendment required that coke be maintained in enclosed (non-open-air) storage.[2] The amendment to rule 1158 and subsequent enactment of the related Health and Safety Code section 40459[3] thus rendered the existing four-walled structure unusable for coke storage as of January 1, 2001. The enclosed storage requirement also made the use of a stacker impossible, because stackers operated by dropping coke through the open top of the structure. In light of these new enclosure requirements, AIMCOR's operations at the site ceased on December 31, 2000.

---

[2] Among other provisions, subdivision (d)(2) of rule 1158 provides that any facility that stores coke must "maintain all piles in enclosed storage," and subdivision (d)(9) provides that any new or replacement conveyors "shall be enclosed conveyors."

[3] Section 40459 provides, in pertinent part, "on or before January 1, 2001, the operator of any facility within either the Port of Los Angeles or the Port of Long Beach that stores, handles, or transports petroleum coke and is subject to the enclosed storage pile deadlines of Rule 1158 shall comply with the enclosure requirement of Rule 1158."

In December 2003, AIMCOR was sold and merged into Oxbow. Oxbow planned to enclose the structure at Pad 14 by placing a roof on it. In February 2005, Long Beach and Oxbow (as a successor to AIMCOR) executed an amendment to the lease. This amendment stated that Long Beach would reimburse Oxbow up to $2,258,000 for the construction of conveyors at Pad 14, and that, following the construction and upon reimbursement, title to the conveyors would be transferred to Long Beach. The lease amendment also stated, "Construction of the Pad 14 Conveyors shall be accomplished in accordance with the laws governing 'public works.' Lessee acknowledges that the reimbursement . . . makes this work paid for in whole or part out of Public funds within the meaning of California Labor Code §1720." The conveyors would be used to transport coke from the outside of the structure to the inside, a task previously performed by the stacker.

The lease amendment did not mention the planned roof. However, a December 15, 2004 memorandum from the director of properties for the Port of Long Beach requesting approval of the lease amendment by the board of harbor commissioners noted how the goal of Long Beach and Oxbow was to maximize the use of the facility in compliance with rule 1158, and "[i]n order to accomplish this, a roof and receiving conveyors will have to be constructed . . . ." The memorandum further explained that Oxbow would be responsible for the cost of constructing the roof, while Long Beach would reimburse at least part of the cost of the conveyors. In addition, a South Coast Air Quality Management District permit was issued for a "petroleum coke receiving and storage system" at the site, "consisting of," among other things, enclosed conveyors and a storage building. A harbor development permit described the approved work as: "Install a roof on the existing 22-foot walls on Pad 14; upgrade existing conveyors and add new conveyors to bring the facility into full rule 1158 compliance; upgrade an existing dust suppression system; and upgrade the existing electrical system."

Oxbow entered into a "New Conveyors Erection Contract" (Conveyors Contract) with Bragg Investment Co., Inc., for erection of the new conveyor system. It entered into a separate "Petroleum Coke Enclosure Design and Erection Contract" (Enclosure Contract) with W.B. Allen Construction, Inc., for construction of the roof, which it paid for with private funds.[4]

The Conveyors Contract called generally for a system consisting of three conveyors—two enclosed conveyors, an open "shuttle" conveyor, and also an

---

[4] The contract price in the Enclosure Contract was $3,712,002. Section 13.2.1 of the Enclosure Contract, however, provided for the potential of a change order in the event that the enclosure work was deemed to be a public work subject to the payment of prevailing wages.

enclosed transfer tower. The first conveyor, which is completely enclosed, runs outside the storage building and conveys coke from ground level up to the enclosed transfer tower, which is also outside the building. Once it reaches the transfer tower, coke is transferred to the second conveyor, which takes coke from the transfer tower through a cupola in the roof of the storage building. The second conveyor is independently enclosed up to the point where it encounters the cupola. The coke is then dumped onto the third conveyor, which runs the length of the structure just under the new roof and dumps it into piles on the floor. The third conveyer is not independently enclosed but, as with the rest of the interior of the building, it is covered by the roof.

The Enclosure Contract stated that its purpose was "to completely enclose the existing storage facility for compliance with" rule 1158. Pursuant to the Enclosure Contract, a roof was built over the storage building, a cupola was built to allow entry of the second conveyor into the building, and framing was built to support the third conveyor inside the structure. It appears that construction of the enclosure and the conveyor system occurred relatively contemporaneously.

*Administrative Determination and Decision*

In January 2006, real party in interest Iron Workers Union Local No. 433 requested a determination from the Department as to whether "construction of the building enclosing the conveyors" on Pier G was ·a public work under section 1720.[5] On October 12, 2007, the Director issued a public works coverage determination (Determination) that found the "replacement conveyor and enclosure improvement work . . . is a single, integrated public works project subject to prevailing wage requirements." The Determination stated that "[c]onstruction under the Enclosure and Conveyor Contracts produced one structure that functioned as a unified system for the distribution and storage of coke," and that "the replacement conveyors were designed as an essential element of the improved enclosure, not as a stand-alone undertaking."

Oxbow and Long Beach thereafter filed an administrative appeal of the Determination, arguing that the work performed under the Enclosure Contract was separate from that performed under the Conveyors Contract, and, though the conveyor work was public work, the enclosure work was private.[6] On July 3, 2008, the Director issued a "Decision on Administrative Appeal"

---

[5] California Code of Regulations, title 8, section 16001, subdivision (a)(1) provides that an interested party may file with the Director a request to determine whether the prevailing wage law applies to a specific project or type of work.

[6] California Code of Regulations, title 8, section 16002.5, subdivision (a) provides that an interested party may file with the Director an appeal of the Director's determination.

(Decision), affirming the Determination. This Decision stated that the conveyor and enclosure improvements "constitute parts that are put together to form 'a complete integrated object,' a petroleum coke handling and storage facility," and that "[w]ithout performance under both contracts, construction would be incomplete and not viable." The Decision affirmed the Determination that the enclosure and conveyance work was construction paid for out of public funds, constituting a public work subject to the prevailing wage law requirements.

*Trial Court Proceedings*

On September 2, 2008, Oxbow filed a petition for writ of mandate in the Superior Court for the County of Los Angeles seeking an order requiring the Department to determine that the enclosure improvement was not a public work subject to California's prevailing wage law.[7] The administrative record was lodged with the trial court and no new evidence was presented.

The trial court denied the petition, and its minute order held the administrative decision correct as a matter of law. Citing *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987–988 [4 Cal.Rptr.2d 837, 824 P.2d 643] (*Lusardi*), the minute order stated that parties may not "by agreement between themselves, thwart or limit the rights of workers to be paid prevailing wage rates on public projects," and "[t]he fact that the parties structured their deal so as to limit the obligation to pay prevailing wage rates on a project does not prevent the [Director] from deciding to the contrary."

Judgment was entered in favor of the Director and Department on August 10, 2009. The appeal is timely.

## DISCUSSION

The facts here are undisputed. Our task, therefore, is a matter of statutory interpretation, determining whether the work at issue was a "public work" under California's prevailing wage law.

### A. *Standard of Review*

In determining whether the prevailing wage law applies, "we must exercise our independent judgment in resolving whether the project at issue constituted a 'public work' within the meaning of the [prevailing wage law]." (*City*

---

[7] California Code of Regulations, title 8, section 16002.5, subdivision (c) provides: "The authority of the Director to determine coverage of projects under the prevailing wage laws is quasi-legislative, and a final determination on any appeal is subject to judicial review pursuant to the Code of Civil Procedure, Section 1085."

*of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949 [22 Cal.Rptr.3d 518, 102 P.3d 904] (*City of Long Beach*), citing *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1583–1584 [18 Cal.Rptr.2d 680] (*McIntosh*).) An agency's interpretation of a statute is "one among several tools available to the court" when judging the meaning and legal effect of a statute. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) Thus, the court considers the Director's interpretation of section 1720. (See *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 304 [76 Cal.Rptr.3d 507] (*State Building*); *Plumbers & Steamfitters, Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1089 [69 Cal.Rptr.3d 184].) Nevertheless, "it is the judiciary which has the ultimate authority for determining the meaning of a statute." (*State Building*, at p. 304, citing *Yamaha*, at pp. 11–12, *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593] and *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

Therefore, although we consider the Director's interpretation, we must independently determine whether the "public work" was *only* the work performed under the Conveyors Contract, or whether it *also* included the work performed under the Enclosure Contract.

## B. *The Prevailing Wage Law*

### 1. *Overview of the Prevailing Wage Law*

■ The purpose of California's prevailing wage law (§§ 1720–1861) is "to protect and benefit employees on public works projects." (*Lusardi, supra*, 1 Cal.4th at p. 985.) "The Legislature has declared that it is the public policy of California 'to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.' [Citation.] The conditions of employment on construction projects financed in whole or in part by public funds are governed by the prevailing wage law. [Citation.]" (*Ibid.*)

The coverage of the prevailing wage law is broad, and a number of specific goals are subsumed within its objective: "to protect employees from substandard wages that might be paid if contractors could recruit labor from distant

cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi, supra,* 1 Cal.4th at p. 987.) The law "was enacted to protect and benefit workers and the public and is to be liberally construed." (*City of Long Beach, supra,* 34 Cal.4th at p. 950.)

■ Section 1771 provides that, aside from certain exceptions not relevant here, all workers on "public works projects" must be paid at least the general prevailing rate of wages. Section 1770 gives the Director the responsibility of determining general prevailing wage rates, and the Director also has the initial authority to determine whether a specific project is a public work subject to the prevailing wage law. (Cal. Code Regs., tit. 8, § 16001, subd. (a).)

## 2. *Section 1720*

The issue presented here is the scope of section 1720, specifically section 1720, subdivision (a)(1), which provides a definition of "public works." Subdivision (a)(1) reads: "As used in this chapter, 'public works' means: [¶] (1) Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority. For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work."

The parties do not dispute that the work done under the Conveyors Contract was paid for out of public funds and subject to the prevailing wage law. The question is whether the work done under the Enclosure Contract was also subject to the prevailing wage law. If the enclosure work fell within the scope of "construction" "paid for in whole or in part out of public funds" then it also fell within the definition of "public works," and was subject to the prevailing wage requirements.

Oxbow argues that the enclosure work and the conveyor work were two separate, independent constructions, that public funding only paid for construction of the conveyor system, and that the roof work was not a public work subject to the prevailing wage law. The Department contends that Oxbow constructed a single, rule 1158-compliant coke loading and storage facility, that construction of the facility was paid for in part out of public funds, and that all of the construction was a public work.

As explained further below, we hold that because the conveyor and enclosure work turned an unusable structure into a functioning coke receiving and storage facility, this constituted "construction," and since the construction was paid for in part out of public funds, it was a public work. The work performed under both the Conveyors Contract and Enclosure Contract therefore was subject to the prevailing wage requirements.

## C. *The Scope of Section 1720, Subdivision (a)(1)*

Oxbow contends that this dispute—which centers on the scope of "construction" paid for in part out of public funds—presents an issue of first impression. Although Oxbow may have framed the issue in a somewhat unique manner, a number of cases have examined the effect of section 1720, subdivision (a) and its term "construction."

■ We are guided by several well-established principles in determining the effect of section 1720, subdivision (a)(1). "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140]; see *McIntosh, supra,* 14 Cal.App.4th at p. 1588.) In making this determination, an individual phrase or term may not be divorced from the statute as a whole; rather, all parts of the statute must be considered. (*State Building, supra,* 162 Cal.App.4th at p. 310 ["That construction is not to be reached by examining bits and pieces of the statute, but after a consideration of all parts of section 1720 in order that we may effectuate the Legislature's intent."].) Finally, our foremost concern is enforcing the purpose of the legislation. (*Lusardi, supra,* 1 Cal.4th 976, 987.)

■ "Construction" is not precisely defined in the Labor Code, although section 1720, subdivision (a)(1) was amended in 2000 (see *City of Long Beach, supra,* 34 Cal.4th at p. 950) to explicitly include preconstruction activities that previously were not referenced: "For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work." While this definition makes clear that for purposes of subdivision (a)(1) "construction" includes design and preconstruction work, it does not explain what "construction" itself is or when it is considered paid for out of public funds.[8]

---

[8] " '[P]aid for in whole or in part out of public funds' " includes the "payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer." (§ 1720, subd. (b)(1).)

Dictionary definitions of "construction" aid in our analysis. Two definitions were cited approvingly by the Supreme Court in *City of Long Beach, supra*, 34 Cal.4th at page 951: "The act of putting parts together to form a complete integrated object." (Webster's 3d New Internat. Dict. (2002) p. 489.) "[T]he action of framing, devising, or forming, by the putting together of parts; erection, building." (3 Oxford English Dict. (2d ed. 1989) p. 794.)

Case law also provides definitions of the term. In *Priest v. Housing Authority* (1969) 275 Cal.App.2d 751, 756 [80 Cal.Rptr. 145], in the context of a case examining section 1720, this district devised the following definition of construction: "As one thinks of 'construction' one ordinarily considers the entire process, including construction of basements, foundations, utility connections and the like, all of which may be required in order to erect an above-ground structure." More recently, "construction" was defined: "The plain meaning of the term 'construction' includes not only the erection of a new structure but also the renovation of an existing one." (*Plumbers & Steamfitters, Local 290 v. Duncan, supra*, 157 Cal.App.4th at p. 1089.)

Inherent in these definitions of construction is the concept that construction is the creation of the whole—the "complete integrated object"—which is composed of individual parts. The Director found that the conveyor and enclosure improvements "constitute parts that are put together to form 'a complete integrated object,' a petroleum coke handling and storage facility," and the trial court relied on a similar analysis to hold that the entirety of the work was construction paid in part out of public funds. Given the facts of this case, we agree that focus on the "complete integrated object" is the best approach.

This approach is consistent with the use of the term "construction" throughout section 1720. Numerous subdivisions refer to construction in terms of a complete product, and none limits the term to the formation of individual pieces of a whole.[9] Furthermore, the 2000 amendment to subdivision (a)(1) evidences the Legislature's intent to give construction a broad meaning, since it expanded "construction" to include design and preconstruction work.

■ A reasonably broad interpretation of a "public work" in the context of "construction paid for in whole or in part out of public funds" is also in keeping with the purpose of the prevailing wage law. As stated by the

---

[9] Section 1720, subdivision (b)(2) pertains to "[p]erformance of construction work by the state or political subdivision in execution of the project," subdivision (c)(4) to "construction or rehabilitation of affordable housing units," subdivision (c)(6) to "construction or rehabilitation of privately owned residential projects," and subdivision (c)(6)(D) to a "project consist[ing] of new construction, or expansion, or rehabilitation work."

Supreme Court in *Lusardi*, "The object that a statute seeks to achieve is of primary importance in statutory interpretation. [Citations.] The overall purpose of the prevailing wage law, as noted earlier, is to benefit and protect employees on public works projects." (*Lusardi, supra*, 1 Cal.4th at p. 987; see also *State Building, supra*, 162 Cal.App.4th at p. 294 ["Labor Code section 1720 embodies the long-standing public policy of California to require employers engaged on public works projects to pay the prevailing wage to their workers if the project is 'paid for in whole or in part out of public funds.' "].)

Thus, an emphasis on the complete integrated object is required in this case.

D. *The Conveyor and Enclosure Work Constituted Construction Paid for in Part by Public Funds*

Oxbow argues that the construction of the enclosure was separate and independent from the construction of the conveyor system and so cannot be considered paid for out of public funds. Oxbow relies on the fact that its amended lease with Long Beach only referenced the planned conveyor work and stated that this work would be reimbursed by Long Beach and be subject to the prevailing wage law. As correctly noted by both the Director and the trial court, however, the danger of Oxbow's argument is that if given effect, it would encourage parties to contract around the prevailing wage law by breaking up individual tasks into separate construction contracts.

This sort of behavior was directly criticized in *Lusardi*. In *Lusardi*, the Supreme Court held that the obligation to pay prevailing wages may not be based solely on contractual provisions, but that the obligation instead flows from the statutory duty embodied within the prevailing wage law. (*Lusardi, supra*, 1 Cal.4th at pp. 986–988.) The *Lusardi* court reasoned that an awarding body and a contractor often have strong incentives to avoid the prevailing wage law and thus may structure their contracts to circumvent it. (*Id.* at pp. 987–988.) The court held that such circumvention conflicts with the law: "To allow this would reduce the prevailing wage law to merely an advisory expression of the Legislature's view." (*Id.* at p. 988.)

By looking at the totality of the underlying facts here, it is clear that no matter what the terms of the amended lease were, the purpose and end result of the construction was a functioning coke receiving and storage facility. Giving effect to Oxbow and Long Beach's agreement to limit public funds to the conveyor system would run afoul of the *Lusardi* rule.

Upon enactment of rule 1158, the open-air structure at Pad 14 became unusable, and remained in that state for several years. After AIMCOR was purchased by Oxbow, Oxbow, through dealings with Long Beach, made plans to make the site usable again. The December 2004 memorandum from the director of properties for the Port of Long Beach stated how the goal of Long Beach and Oxbow was to maximize the use of the facility in compliance with rule 1158, and that "[i]n order to accomplish this, a roof and receiving conveyors will have to be constructed . . . ." The South Coast Air Quality Management District permit stated that the "petroleum coke receiving and storage system" would consist of enclosed conveyors and a storage building, and the harbor development permit noted how work would "bring the facility into full rule 1158 compliance" through installation of the roof, completion of the conveyor work, and other associated tasks.

Contrary to Oxbow's assertions, the conveyor system and enclosure work were not separate and independent. Both the construction and conveyance work occurred at the same site and at or near the same time. The Enclosure Contract specifically noted that the other work would be "interfacing to" or "in close proximity" to the enclosure work, and that Oxbow was to "assist the Enclosure Contractor in coordinating its work with the work to be performed by the Conveyors Contractor . . . ."

Rule 1158 generally requires that coke be enclosed, including when on a conveyor. Although the first conveyor is independently enclosed, the second conveyor relies on the cupola constructed pursuant to the Enclosure Contract to enter the building, and the third conveyor is not independently enclosed at all, but relies entirely on the newly constructed roof to meet the rule 1158 enclosure requirement. The framing necessary to support the third conveyor was also built pursuant to the Enclosure Contract. Thus, the work performed under the Conveyors and Enclosure Contracts was interdependent, and without the work performed pursuant to the Enclosure Contract, the conveyor system would be unusable.

In order for the Pad 14 facility to be functional, it needed to incorporate both a method of enclosing the coke and of moving the coke into the facility. Oxbow contends that the conveyors may not have been necessary to render the site compliant with rule 1158 and speculates that other methods could have been used. Oxbow acknowledges that use of a stacker became impossible, however, and the record does not reveal any consideration of methods aside from the conveyors for loading coke into the enclosed facility. But even if alternatives had been considered, this would not change our analysis. A method of loading coke into the structure was required. The conveyor system

was the chosen method and, in tandem with the enclosure work, it rendered the facility rule 1158 compliant and usable.[10]

■ We therefore find that since the construction of the lawful and functional coke receiving and storage facility was paid for in part by public funds, it was a "public" work, and the work performed under both the Enclosure Contract and Conveyors Contract was subject to the prevailing wage law.[11]

### E. Oxbow's "Project Approach" Argument

Oxbow takes issue with the Director's use of the term "project" in his "Determination and Decision." It argues that the Director improperly equated "construction" with "project," and that this "project approach" is not authorized by section 1720, subdivision (a)(1).

Oxbow is correct that section 1720, subdivision (a)(1) does not include the term "project." It is also correct that a determination of a "public work" pursuant to section 1720, subdivision (a)(1) must be based on the actual terms in the section, and analyzing whether something is a "project" paid for by public funds to the exclusion of analyzing whether it is "construction" paid for by public funds would be improper. Oxbow's concerns with the use of the term "project" in this case are overblown, however. "Project" is a term often used in conjunction with or in place of "construction," both in the context of the Labor Code and in areas far removed. (See, e.g., Lab. Code, §§ 1720, subds. (b)(2) ["[p]erformance of construction work by the state or political subdivision in execution of the project"] & (c)(6) ["construction or rehabilitation of privately owned residential projects"], especially (c)(6)(D) ["project consist[ing] of new construction, or expansion, or rehabilitation

---

[10] Oxbow describes various hypothetical situations to argue that focus on the complete facility is improper. We agree that there may be situations in which construction activities are not implicated by the prevailing wage law even though other construction activity is publicly funded. Given the facts of this case, however, in which the structure had been unusable, the conveyor work and enclosure work were intended to make and did make a rule 1158-compliant facility, and the conveyor and enclosure work were closely related and interdependent, the correct conclusion is that the entirety of this work was construction paid for in part out of public funds.

[11] Long Beach filed a "Respondent's Brief" which, in part, repeated Oxbow's argument that the work done under the Conveyors Contract was not subject to the prevailing wage law. Long Beach also made a separate argument that it was not an "awarding body" for purposes of the prevailing wage law. To the extent that Long Beach presents this "awarding body" argument as an issue for appeal, it is procedurally improper, including because Long Beach failed to file a notice of appeal. (See Code Civ. Proc., § 906; Estate of Powell (2000) 83 Cal.App.4th 1434, 1439 [100 Cal.Rptr.2d 501].) In any event, since resolution of this issue is unnecessary to decide this appeal, we do not address it. (See Young v. Three for One Oil Royalties (1934) 1 Cal.2d 639, 647 [36 P.2d 1065].)

work"], 1771 [referring to "public works projects"]; *Lusardi, supra*, 1 Cal.4th at p. 985 ["The conditions of employment on construction projects financed in whole or in part by public funds are governed by the prevailing wage law."]; *State Building, supra*, 162 Cal.App.4th at p. 294 ["Labor Code section 1720 embodies the long-standing public policy of California to require employers engaged on public works projects to pay the prevailing wage to their workers if the project is 'paid for in whole or in part out of public funds.' "]; see also *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 30–31 [50 Cal.Rptr.3d 597, 145 P.3d 472] [referring to "construction project" in insurance coverage dispute]; *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 966 [22 Cal.Rptr.3d 340, 102 P.3d 257] [pertaining to alleged lost future profit damages on "construction projects"].) The fact that the Director's and the trial court's decisions refer to a "project" does not per se invalidate their analyses. The trial court was correct to enter judgment in favor of the Department and Director, and that decision will not be disturbed.

Oxbow also overstates the applicability of *Greystone Homes, Inc. v. Cake* (2005) 135 Cal.App.4th 1 [37 Cal.Rptr.3d 183] (*Greystone Homes*). The court in *Greystone Homes* found that a project to build a housing development was not a public work subject to the prevailing wage law. (*Id.* at p. 4.) The issue in *Greystone Homes* was whether contribution of a parcel of land, a traffic mitigation fee, and reimbursement of parcel acquisition costs constituted payment for construction under former section 1720, subdivision (a). (*Greystone Homes*, at pp. 10–11.) "[T]he dispositive question in the present case is whether *actual construction* of the new development . . . was paid for in whole or in part out of public funds." (*Id.* at p. 10.) The *Greystone Homes* court found that since the public funds were used to pay for land acquisition, *not* construction costs, the project was not a public work under former section 1720, subdivision (a). (*Greystone Homes*, at p. 11.)

In this case, there is no dispute that actual construction was paid for in part out of public funds, and *Greystone Homes* offers no support for Oxbow's contention that actual "construction" must be circumscribed and limited to only the conveyors work. Oxbow also asserts that Long Beach's payment was "earmarked" to be used solely for the costs of the conveyor system. But deference to such an earmark would run afoul of the rule proclaimed in *Lusardi, supra*, 1 Cal.4th at pages 986–988, that parties may not contract around the prevailing wage law. *Greystone Homes* did not overturn or even reach the *Lusardi* rule.

Similarly misplaced is Oxbow's reliance on *City of Long Beach*, a case that also examined the scope of former section 1720, subdivision (a). As explained above, prior to its 2000 amendment, section 1720, subdivision (a) did

not reference " 'design and preconstruction phases.' " (*City of Long Beach, supra*, 34 Cal.4th at p. 946.) The agreement and grant of public funds in *City of Long Beach* predated the 2000 amendment, and the public funds were expressly limited to project development and other preconstruction expenses. (*Ibid.*) The Supreme Court's focus, therefore, was whether the amendment to section 1720, subdivision (a) operated prospectively or retroactively, since the preconstruction expenses at issue would be covered by the language of the *amended* section 1720, subdivision (a). (*City of Long Beach*, at pp. 952–953.) In holding that the changes to the section only operated prospectively, the court relied primarily on the amendment's legislative history, which specifically called for prospective application affecting only public works contracts entered into after the amendment's effective date. (*Ibid.*)

Again, there are no preconstruction or design costs at issue in this case, and there is no dispute over whether the public funds went to actual construction. Oxbow argues that *City of Long Beach* demonstrates a requirement of narrowly construing actual "construction" paid for out of public funds. It does no such thing. No party in *City of Long Beach* contended that in determining the scope of actual construction, the court is bound by the terms of contracts pertaining to component parts. The ruling in *City of Long Beach* was dependent on the legislative history of the section 1720, subdivision (a) amendment, an amendment that, as explained above, indicated the Legislature's intent to prospectively expand the scope of "construction" paid for out of public funds.

F.   *Oxbow's Proposed Test Is Unworkable*

Finally, Oxbow requests that this court establish a test to determine whether work constitutes "construction." Under Oxbow's proposed test, "construction" can be either: "(1) a construction that constitutes an end product in its own right; or (2) in the context of multiple construction activities, work that amounts to a single, interdependent, integrated construction." The Department responds that Oxbow's test is confusing and ambiguous. We agree, and reject Oxbow's proposed test.

We note first that previous attempts to arbitrarily limit the scope of terms in section 1720, subdivision (a) have been denied. In *Priest v. Housing Authority, supra*, 275 Cal.App.2d at pages 755–756, the appellant tried to parse the meaning of the term "demolition" under section 1720, arguing the undefined term only encompassed destruction of objects above ground. The Second District rejected that argument, finding that if appellant's definition were followed, "then the word is to be given a limitation not spelled out by the Legislature." (275 Cal.App.2d at p. 756.)

■  In the recently published case of *Azusa Land Partners v. Department of Industrial Relations* (2010) 191 Cal.App.4th 1 [120 Cal.Rptr.3d 27] (*Azusa Land Partners*), this district found an entire housing development project was a "public work" under section 1720, subdivision (a)(1) because a portion of the project was publicly funded using proceeds of Mello-Roos bonds. (*Azusa Land Partners*, at pp. 19–22.) The appellant argued that only the portion of the work done for an "improvement district" should be considered a public work, because this term, which appears in section 1720, subdivision (a)(2) ("[w]ork done for . . . improvement districts"), is more specific than subdivision (a)(1). The court rejected this argument. (*Azusa Land Partners*, at pp. 19–22.) Later in the opinion, citing *Lusardi, supra*, 1 Cal.4th at pages 987–988, the court wrote: "It is theoretically possible to apportion public funds to specific works of improvement or, to use the parties' example, to the construction of a sidewalk on the left side of a street while apportioning private funding to the right side. The Supreme Court, however, has specifically rejected a contract-based analysis that would allow a developer and public entity to agree to allocate all public funds to one piece of improvement work instead of applying it, in part, to pay for all required improvements." (*Azusa Land Partners*, at p. 35.)[12] This holding applies equally well here.

We also find that Oxbow's test is apt to cause more confusion than the statutory language it seeks to replace. Under the test, the conveyor system may or may not be an "end product in its own right," and the conveyor system could also be considered one piece of work that resulted in a "single, interdependent, integrated construction." Is the conveyor system an end product? Without a rule 1158-compliant structure where it can dump coke it would appear to be useless. Further, without the cupola and framing built pursuant to the Enclosure Contract, the conveyor system would not function. And, as explained above, without both the enclosure and a lawful method of moving coke into the enclosed building, the structure at Pad 14 would still be unusable. Thus, even under Oxbow's test, the "construction" would likely still be the functional coke receiving and storage facility.

■  In any event, there is no reason to define "construction" using Oxbow's unwieldy test. A determination of what constitutes "construction" paid out of public funds will necessarily depend on the statutory language and the specific facts in each case. A test of the sort recommended by Oxbow seems impossible to implement, and Oxbow's own proposed test demonstrates the fallacy of this approach.

---

[12] *Azusa Land Partners* also examined the effect of an exemption contained in section 1720, subdivision (c)(2), which is not at issue here.

## DISPOSITION

The judgment is affirmed.

Doi Todd, J., and Chavez, J., concurred.