[No. D057277. Fourth Dist., Div. One. July 26, 2011.]

HENSEL PHELPS CONSTRUCTION COMPANY et al., Plaintiffs and Respondents, v.
SAN DIEGO UNIFIED PORT DISTRICT, Defendant and Respondent;
CARPENTERS/CONTRACTORS COOPERATION COMMITTEE, INC., Intervener and Appellant.

1022

## COUNSEL

DeCarlo, Connor & Shanley and Desmond C. Lee for Intervener and Appellant.

Altshuler Berzon, Scott A. Kronland and Matthew J. Murray for State Building and Construction Trades Council of California as Amicus Curiae on behalf of Intervener and Appellant.

Law Offices of Carroll & Scully, Inc., Donald C. Carroll and Charles P. Scully II for Southern California Labor/Management Operating Engineers Contract Compliance Committee as Amicus Curiae on behalf of Intervener and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard M. Freeman and Matthew S. McConnell for Plaintiffs and Respondents.

Duane E. Bennett and David Catalino for Defendant and Respondent.

## OPINION

**IRION, J.**—California's prevailing wage law (Lab. Code, § 1720 et seq.) (the PWL)[1] provides that, with certain exceptions, the prevailing wage "shall be paid to all workers employed on public works." (§ 1771.) In this appeal we consider whether a hotel construction project on land that the San Diego Unified Port District (the Port District) leases to the hotel owner qualifies as a public work within the meaning of the PWL where the lease specifies that the

---

[1] Unless otherwise specified, all further statutory references are to the Labor Code.

Port District will provide what the lease refers to as a "rent credit" in the total amount of $46.5 million during the first 11 years of the lease.

In ruling on a petition for writ of mandate (Code Civ. Proc., § 1085) from a decision of the Department of Industrial Relations (DIR), the trial court held that the hotel construction project was not a public work subject to the PWL, and it therefore granted the petition. On our independent review of the question of statutory interpretation presented to us, we disagree with the trial court. The hotel project, which was constructed pursuant to the terms of the lease with the Port District, is a public work because (1) it constitutes "[c]onstruction . . . done under contract" (§ 1720, subd. (a)(1)) and (2) the construction was "paid for in whole or in part out of public funds," within the meaning of section 1720, subdivision (a)(1), due to the $46.5 million in rent credit provided by the Port District in the lease. Accordingly, we conclude that the PWL is applicable to the hotel construction project, and we reverse the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Port District's Negotiations for Development of a Hotel on the Property*

The Port District is a public corporation created by the Legislature (Stats. 1962, 1st Ex. Sess., ch. 67, p. 362, Deering's Ann. Harb. & Nav. Code—Appen. 1 (1996 ed.) § 1 et seq., p. 770).[2] Among the properties that the Port District has the authority to offer for lease is a waterfront parcel near the San Diego Convention Center, commonly referred to as the Campbell Shipyard site (the Property). The Port District had attempted to develop a hotel on the Property for several years, but negotiations with potential developers were unsuccessful.[3]

The Port District renewed its development efforts in early 2002 by issuing a request for proposal (RFP) for a hotel to be built on the Property. The term sheet for the RFP provided, among other things, that the Port District was

---

[2] There is no dispute that the Port District is a political subdivision within the meaning of section 1721 of the PWL.

[3] Development of a hotel on the Property would serve the purpose, among other things, of providing additional hotel rooms for the convention center and would fulfill an agreement that the Port District entered into with the City of San Diego in 1999 to accelerate development of a hotel on the Property in order to develop tax revenues to assist the city in repaying bonds issued for construction of a downtown baseball stadium.

seeking the construction of "[a] four-star quality convention center headquarters hotel, not exceeding 499 feet in height and containing 1,000–1,200 guestrooms," with a 35,000-square-foot ballroom and "amenities such as restaurants, cocktail lounges, retail space, a swimming pool and health spa." The term sheet specified that rent would be paid to the Port District calculated as a percentage of the gross income generated from hotel operations, including 7 percent of the gross income from rental of guestrooms, 3 percent of the gross income from food sales, and 5 percent of the gross income from beverage sales. During construction, a minimum annual rent payment of $2.25 million was to be paid to the Port District for the first two years and, upon the opening of the hotel, a minimum annual rent of $4.5 million was to be paid for the third through 20th years.

The Port District received four proposals for development of the hotel, one of which was from Hilton San Diego Convention Center, LLC (HSDCC). HSDCC's response to the RFP estimated total project costs at $292.5 million and stated, "Our financial analysis indicates the [Port] District will need to consider economically supporting the project."

The Port District selected the HSDCC proposal and, in August 2002, entered into an option agreement with HSDCC. The proposed terms of the lease negotiated at the time of the option agreement provided that HSDCC would receive a rent credit equal to 60 percent of the rent due each month for 11 years, not to exceed a total of $46.5 million. The rent credit was explained in the agenda for the meeting at which the Port District's board approved the option agreement with HSDCC: "When negotiations commenced . . . , it was known that HSDCC was requesting a $26.5 million cash subsidy payable at, or shortly after, lease commencement (the other three proposers . . . also requested subsidies up to as much as $80 million). The Option Agreement provides for the $26.5 million subsidy to be taken by HSDCC in the form of rent credits, equal to 60% of rent due, until $46.5 million (which includes interest at a rate approximately equal to 8.4%) has been received or 11 years, which ever occurs first."

In April 2005, during the term of the option agreement, HSDCC wrote to the Port District to advise that its construction costs had increased, and therefore it needed additional financial support from the Port District or other public entities to ensure that the project could go forward. HSDCC noted that the additional financial support was warranted "considering the one-billion-dollar economic impact this project will have to the surrounding community upon completion." In September 2005, HSDCC again wrote to the Port District explaining that project costs had increased to approximately $350 million and requesting an acceleration of the rent credit.

In response to these requests, the Port District in November 2005 approved an amendment to the proposed lease terms to provide for a 100 percent rent credit for the first two years, instead of a 60 percent credit, which was expected to result in an approximate $3 million savings to HSDCC.[4]

HSDCC assigned its option to One Park Boulevard, LLC (OPB), and in December 2005, the Port District and OPB entered into a lease agreement (the Lease).

## B. *The Lease*

The Lease between the Port District and OPB grants a 66-year lease of the Property to OPB exclusively for the purpose of an "upscale major convention-center-oriented headquarters hotel" with 1,100 to 1,200 guestrooms, banquet and conference rooms, restaurant and cocktail lounges, retail space and a "public park/plaza of 4.3 acres" open daily for public use (the Project). The Lease provides that OPB shall pay rent according to a schedule of percentage rents for various income-producing activities by the hotel, with the possibility of an increased percentage in certain years if OPB exceeds its projected gross income.[5] The Lease also provides that the Port District is entitled to receive a guaranteed minimum annual rent, which during the first two years of the Lease is $2.25 million, and for the third through 20th years of the Lease is $4.5 million.[6] For periods beyond those dates, the Lease states that the parties are to mutually agree upon the rent at the beginning of each subsequent 10-year period, with resort to arbitration if necessary.

Consistent with the parties' negotiations during the RFP process and the option period, the Lease also provides for a "rent credit," which is to be

---

[4] An internal Port District memorandum from September 2005 stated that "[HSDCC's] project cost has soared" primarily because of "[s]ubstantial increases in the cost of steel, concrete, and fuel," and that "[f]or approximately a year, [HSDCC] has been making numerous requests to the [Port] District for assistance." The memorandum referred to the rent credit acceleration as a concession to keep HSDCC from pulling out of the project. An August 2005 internal Port District memorandum stated that the benefit to HSDCC from the rent credit acceleration was that it would not have to increase the amount of its construction loan in the amount of the rent that otherwise would have been due during the first two years.

[5] Specifically, the Lease states that "[p]ercentage rents shall be calculated on a monthly basis and shall be based on" the schedule of percentages set forth in the Lease. The percentage rents are based on a schedule approved by the Port District's board for all of its leased properties, which is arrived at through an appraisal process.

[6] The Lease states that "[t]he rent . . . shall be a minimum of [$2.25 million] per year during the first two years of this Lease and [$4.5 million] per year during the third through twentieth year of this Lease."

applied until the credit equals $46.5 million, or December 31, 2016, whichever occurs first.[7] The rent credit consists of (1) 100 percent of the monthly rent until the 34th month of the Lease, unless construction is not completed by that month, in which case the 100 percent credit may extend up to the 36th month and (2) 60 percent of the rent thereafter.

The Lease requires that construction begin within two months, that the Port District approve the plans and specifications for the Project, and that OPB spend a minimum of $220 million on improvements at the Project.

According to the Lease, title to the buildings and other improvements on the Property will be vested in OPB, except that upon the termination of the Lease, the Port District will have the option to have the improvements removed at the expense of OPB, and will obtain title to any improvements that are not timely removed in response to its request.

After the Lease was executed, OPB contracted with Phelps Portman San Diego, LLC (Phelps Portman), to serve as the developer of the Project, and Phelps Portman contracted with Hensel Phelps Construction Company (Hensel Phelps) to serve as the construction manager.

The Port District required Hensel Phelps to execute a completion guaranty, in which it guaranteed, among other things, "the completion and construction of the Project" in a timely manner, in accordance with the terms of the Lease and the plans defined therein.

Construction on the Project started in 2006.

## C. *Proceedings in the Department of Industrial Relations*

Under a regulatory provision allowing any interested party to file a request with the DIR to determine whether a specific project is covered by the PWL (Cal. Code Regs., tit. 8, § 16001), Carpenters/Contractors Cooperation Committee, Inc. (CCCC), and Southern California Labor/Management Operating Engineers Contract Compliance Committee (Operating Engineers Committee) requested a determination from the DIR that the Project was a public work subject to the PWL.

On April 1, 2008, the DIR's director (the Director) issued an initial determination that the Project was a public work subject to the PWL. The

---

[7] With respect to the rent credit, the Lease provides that "[n]otwithstanding anything to the contrary [in the paragraph setting forth the parties' agreement concerning rent] [OPB] shall receive" the credits described in the Lease.

initial determination concluded that (1) the Project involved "[c]onstruction . . . done under contract" within the meaning of § 1720, subd. (a)(1)) and (2) the construction was "paid for in whole or in part out of public funds" because that term is defined by statute to include "rents . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven" (§ 1720, subd. (b)(4)) and the rent credit in the Lease constituted a reduction in rent. Hensel Phelps and Phelps Portman administratively appealed the initial determination. (See Cal. Code Regs., tit. 8, § 16002.5 [providing for an appeal from a determination that a project is covered by the PWL].) The Director affirmed the initial determination on June 20, 2008.

## D.   *The Trial Court's Decision*

Hensel Phelps and Phelps Portman (Petitioners) then filed a petition for writ of mandate in the trial court pursuant to Code of Civil Procedure section 1085 against the DIR and the Director, along with the Port District as an interested and necessary party.[8] The trial court allowed CCCC to intervene in the action, and the DIR and the Director answered the petition.

The parties submitted stipulated excerpts from the administrative record to the trial court, along with written briefing. The trial court heard oral argument and thereafter issued a written ruling granting the petition and directing the DIR and the Director to rescind and vacate the coverage determination and issue a ruling that the Project is not a public work subject to the PWL.

Reaching only the issue of whether the Project was paid for in part out of public funds, the trial court observed that there were two possible bases for a conclusion that public funds were a source of payment. Specifically, based on the text of section 1720, subdivision (b)(4), either rent was "reduced, . . . waived, or forgiven" or rent was "charged at less than fair market value." The trial court concluded that neither situation was present. First, the rent credit specified in the Lease was not a reduction, waiver or forgiveness of rent because "there is no baseline against which to measure" the rent. Second, the appraisal obtained by Petitioners and "the fact that the Lease was reached after arms-length negotiations between sophisticated parties" established that rent was not charged at less than fair market value.[9]

---

[8] Originally, the pleadings also included a cause of action for declaratory and injunctive relief, but Petitioners dismissed that cause of action early in the proceedings.

[9] The trial court denied CCCC's request for judicial notice of two items, namely an article from Los Angeles Lawyer magazine and pages printed from the Hilton San Diego Bayfront Hotel Web site. Although CCCC refers to those exhibits in its appellate briefing, it has not renewed its request for judicial notice with us; nor has it challenged the trial court's denial of the request for judicial notice. The documents are therefore not properly before us, and we do not consider them.

Relying on the standing conferred on it as an intervener, CCCC has appealed the trial court's ruling. (*Gray v. Begley* (2010) 182 Cal.App.4th 1509, 1521 [106 Cal.Rptr.3d 729] [a party properly permitted to intervene " 'obtain[s] all rights of a party defendant, including the right to appeal' "].)[10]

II

DISCUSSION

A. *Standard of Review*

This proceeding was brought as a petition for a writ of mandate under Code of Civil Procedure section 1085 pursuant to the DIR's regulations stating that "[t]he authority of the Director to determine coverage of projects under the prevailing wage laws is quasi-legislative, and a final determination on any appeal is subject to judicial review pursuant to the Code of Civil Procedure, Section 1085." (Cal. Code Regs., tit. 8, § 16002.5, subd. (c).)

Normally a court's review of an agency's decision under Code of Civil Procedure section 1085 " ' " ' "is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support," ' . . . [and] [t]he petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law." ' " (*City of Arcadia v. State Water Resources Control Bd.* (2010) 191 Cal.App.4th 156, 170 [119 Cal.Rptr.3d 232].) " '*If* the agency's action depends solely upon the correct interpretation of a statute, that is a question of law upon which the court exercises its independent judgment.' " (*Ibid.*) " ' "We review the record de novo except

---

[10] The Port District has submitted a brief joining in and adopting the arguments of Petitioners. We have also received amicus curiae briefs from (1) State Building and Construction Trades Council of California (State Building), and (2) Operating Engineers Committee, both advocating that we reverse the judgment.

Amicus curiae State Building has filed a request that we take judicial notice of three decisions of the DIR. Petitioners have opposed the request with respect to one of the DIR decisions—*Oxnard Marketplace Shopping Center—Fry's Electronics*, Public Works case No. 2005-016, December 1, 2006 (*Oxnard Marketplace*)—on the ground that the superior court ordered that decision to be vacated (which is a fact that is noted in State Building's submission). Further, Petitioners request that we take judicial notice of the superior court order directing the DIR to vacate the *Oxnard Marketplace* decision. We note that the DIR's decision in *Oxnard Marketplace* is already before us because it is contained in the excerpts from the administrative record provided by the parties to the trial court. Therefore, we deny as unnecessary State Building's request to take judicial notice of the *Oxnard Marketplace* decision by the DIR. We grant Petitioners' request to take judicial notice of the superior court order directing the DIR to vacate its decision in *Oxnard Marketplace*. We further grant State Building's unopposed request to take judicial notice of two other DIR decisions attached as exhibits 1 and 3 to its request for judicial notice.

where the trial court made foundational factual findings, which are binding on appeal if supported by substantial evidence." ' " (*Ibid.*)

Our Supreme Court has treated the question of whether the PWL applies to a specific project as a question of statutory interpretation to which a court applies its independent judgment, rather than reviewing to determine whether the agency's decision was arbitrary and capricious. (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949 [22 Cal.Rptr.3d 518, 102 P.3d 904] (*City of Long Beach*).) Therefore, except to the extent that we defer to any findings of fact made by the trial court that are supported by substantial evidence, "we must exercise our independent judgment in resolving whether the project at issue constituted a 'public work' within the meaning of the PWL." (*Ibid.*) "Where . . . the facts are undisputed, and the purely legal issues involve the interpretation of a statute an administrative agency is responsible for enforcing, we exercise our independent judgment, 'taking into account and respecting the agency's interpretation of its meaning.' . . . The agency's interpretation is ' "one of several interpretive tools that may be helpful. In the end, however, '[the court] must . . . independently judge the text of the statute.' " ' " (*Azusa Land Partners v. Department of Industrial Relations* (2010) 191 Cal.App.4th 1, 14 [120 Cal.Rptr.3d 27], citations omitted (*Azusa Land Partners*).)

B. *Applicable Legal Framework*

Turning to the substantive issue before us—namely whether the Project is a public work—we first discuss the applicable statutory provisions.

As relevant here, section 1720, subdivision (a)(1) of the PWL defines " 'public works' " to mean: "Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds . . . ."

Before 2002, the PWL did not define the phrase "paid for in whole or in part out of public funds," and thus decisions from the DIR or judicial case law was required to interpret whether specific situations involved a payment of public funds. One of the most notable cases interpreting the phrase was *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576 [18 Cal.Rptr.2d 680] (*McIntosh*). In *McIntosh*, the court determined that the construction of a residential care facility pursuant to a sublease that Riverside County entered into with a private entity was *not* paid for in whole or in part out of public funds, even though, among other things, the county (1) had agreed to 100 percent rent forbearance during the first 20 years of the sublease; (2) absorbed certain inspection and project management costs; and (3) paid certain bond premiums on the project, in the form of an interest-free loan.

(*Id.* at pp. 1587–1592.) *McIntosh* noted that "Legislators could easily express an intent to bring waived costs (or rent) within the concept of payment with 'public funds' but have not done so." (*Id.* at p. 1590.)

"*McIntosh* generated repeated attempts in the Legislature to modify or overturn it. These efforts culminated in the passage of Senate Bill No. 975 (2001–2002 Reg. Sess.) in 2001. (Stats. 2001, ch. 938, § 2.)" (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 307 [76 Cal.Rptr.3d 507] (*State Building*).)

Among other things, Senate Bill No. 975 (2001–2002 Reg. Sess.) added section 1720, subdivision (b), which, as it currently reads, defines the term "paid for in whole or in part out of public funds," as follows:

"(b) For purposes of this section, 'paid for in whole or in part out of public funds' means all of the following:

"(1) The payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer.

"(2) Performance of construction work by the state or political subdivision in execution of the project.

"(3) Transfer by the state or political subdivision of an asset of value for less than fair market price.

"(4) Fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision.

"(5) Money loaned by the state or political subdivision that is to be repaid on a contingent basis.

"(6) Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision." (§ 1720, subd. (b).)[11]

As stated in Senate Bill No. 975's legislative history, "[t]he definition of public funds . . . seeks to remove ambiguity regarding the definition of public

---

[11] The portions of section 1720, subdivision (b) quoted above include additional amendments made in 2002 (Stats. 2002, ch. 1048, § 1, p. 6778) that are not pertinent to our analysis.

subsidy of development projects." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 975 (2001–2002 Reg. Sess.) as amended Aug. 30, 2001, p. 5.)

The most applicable subpart here is section 1720, subdivision (b)(4), which refers to "rents . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven."

## C. *The Project Is a Public Work Subject to the PWL*

■  Section 1720, subdivision (a)(1) sets forth two separate statutory requirements for the Project to be considered a "public work." First, as relevant here, a public work must involve "[c]onstruction . . . done under contract." (§ 1720, subd. (a)(1).)[12] Second, the statute states that the construction must be "paid for in whole or in part out of public funds." (§ 1720, subd. (a)(1).) We therefore proceed to consider whether both requirements are satisfied.[13]

### 1. *Construction Done Under Contract*

We first address whether the Project consisted of "[c]onstruction . . . done under contract." (§ 1720, subd. (a)(1).) CCCC contends that—as the Director concluded—the requirement is satisfied; Petitioners contend that it is not.[14]

According to Petitioners, there was no " 'construction . . . done under contract' " as required by section 1720, subdivision (a)(1) because "the Port [District] did not enter into a construction contract with OPB or anyone else to build the Project. All the Port [District] did was enter into a ground lease for raw land with OPB." Petitioners point out that OPB was the entity that

---

[12] The statute also refers to other activities in addition to construction, namely "alteration, demolition, installation, or repair work." (§ 1720, subd. (a)(1).) Those activities do not appear to be applicable here, and thus we do not discuss them.

[13] There is some dispute among the parties as to whether a challenge to the requirement that there be "[c]onstruction . . . done under contract" was raised before the DIR, and therefore whether the courts should reach the issue in considering the petition for writ of mandate. According to our review of the record, although Hensel Phelps's written materials did not specifically raise the issue, briefing by other interested parties sufficiently raised the issue, and the Director ruled in the initial determination that the Project involved construction done under contract. The issue was squarely presented to the trial court by Hensel Phelps and briefed by the parties.

[14] As we have explained, the trial court did not need to reach the issue of whether the Project was "[c]onstruction . . . done under contract" because it concluded that the Project was not paid for in whole or in part out of public funds. Because the applicable facts are undisputed, we decide the issue as a legal matter without the trial court first making a ruling on it.

entered into a contract with the developer—Phelps Portman—and the developer in turn entered into a construction contract with Hensel Phelps. Further, according to Petitioners, there is no " 'construction . . . done under contract' " unless it is possible to " 'connect the dots' to establish that money or its equivalent went from the Port [District] to Phelps Portman or Hensel Phelps."

According to CCCC, because the Lease calls for OPB to construct a hotel on the Property according to the Port District's specifications, the Project is properly classified as "[c]onstruction . . . done under contract." (§ 1720, subd. (a)(1).)

As we will explain, we conclude that CCCC has the better argument. The Project constituted "[c]onstruction . . . done under contract" within the meaning of the PWL.

We first examine Petitioners' argument that the contract between the Port District and OPB was "not a contract for the construction of a hotel" and "was instead a ground lease." In our view, Petitioners' characterization of the parties' contractual relationship is inaccurate and overly simplistic. The document signed by the parties is called a "Lease," but it plainly requires construction of a hotel according to the Port District's exacting specifications. The Lease states that "[n]ot later than two (2) months after the Commencement Date of this Lease, [OPB] shall commence the construction of and diligently proceed to completion of the Project" and that, with certain exceptions, "[t]he Project shall be substantially in accordance with plans and specifications . . . approved in writing by [the Port District.]" The Lease requires that OPB spend a minimum of $220 million on construction, and that each 90 days it furnish statements to the Port District itemizing the actual construction costs. According to the Lease, OPB's failure to comply with any of the contractual provisions concerning the construction project would constitute a breach and cause for termination. Moreover, the history of the Port District's efforts to develop the Property, as expressed in the RFP, shows that the purpose of entering into the Lease with OPB was to obtain construction of a hotel on the Property, not merely to lease the Property.

It is also significant that the Port District required a guaranty signed by Hensel Phelps, the general contractor on the Project, for the purpose of guaranteeing "the completion of construction of the Project." The requirement of a guarantee from the contractor shows that the Port District was focused on obtaining construction of the Project, not just leasing the land.

We next address Petitioners' argument that a Project cannot constitute " 'construction . . . done under contract' " unless it is possible to " 'connect the dots' to establish that money or its equivalent went from the Port

[District] to Phelps Portman or Hensel Phelps." According to Petitioners, "[n]one of the purported 'rent credit' . . . can be shown to have paid for actual construction." We reject this argument on both a factual basis and as a matter of statutory interpretation.

The argument lacks factual support because the rent credit provided in the Lease was intended to subsidize the construction of the Project. As we have described, the record establishes that the rent credit was set at 100 percent during the first 34 to 36 months of the Lease because the cost of constructing the Project had increased from the initial estimates, and HSDCC appealed to the Port District to subsidize some of those increased costs so that the Project could go forward. Moreover, the duration of the 100 percent rent credit was dependent upon the date on which construction was completed. These facts together establish that the rent credit was given for the purpose of subsidizing construction.

■ We also find no support in the statutory language for Petitioners' contention that a project does not constitute " 'construction . . . done under contract' " unless the public agency pays the actual costs of construction rather than providing a different type of subsidy to the project. Indeed, the language of section 1720, subdivision (b) suggests that the opposite is the case. In defining the types of public subsidies that will render a project " 'paid for in whole or part out of public funds,' " the statute specifies numerous types of subsidies that, as a practical matter, cannot be used to pay the actual construction costs, but can serve to reduce a developer's project costs. Among such subsidies are a public entity's (i) performance of construction work (§ 1720, subd. (b)(2)); (ii) transfer of an asset for less than fair market price (§ 1720, subd. (b)(3)); (iii) payment, reduction, forgiveness or waiver of fees, costs, rents, bond premiums or interest rates (§ 1720, subd. (b)(4)); and (iv) allowance of credits against payment obligations (§ 1720, subd. (b)(6)). The Legislature's inclusion of these items would serve no purpose if the phrase "[c]onstruction . . . done under contract" is understood to mean that the public agency must contract to pay the *actual costs* of construction. ■ We will not adopt a statutory interpretation that renders meaningless a large part of the statutory language. (See *People v. Lara* (2010) 48 Cal.4th 216, 227, fn. 17 [106 Cal.Rptr.3d 208, 226 P.3d 322] [" '[I]n reviewing the text of a statute, we must follow the fundamental rule of statutory construction that requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary.' "].)

Petitioners cite several cases in support of their argument that the Project does not constitute "[c]onstruction . . . done under contract" within the meaning of the PWL. None of those cases are controlling.

First, Petitioners cite *International Brotherhood of Electrical Workers v. Board of Harbor Commissioners* (1977) 68 Cal.App.3d 556 [137 Cal.Rptr. 372], in which the City of Long Beach entered into a contract with a private entity to extract oil and gas from public lands. The court concluded a "public work" was not at issue because although the contract called for the developer to construct drilling and collateral equipment insofar as that equipment was " 'required for the performance of the Contractor's obligations' " of conducting oil recovery operations (*id.* at p. 564), the contractual arrangement was "in essence, an oil and gas lease, calling for payment of royalties to the city," and not a construction contract (*id.* at p. 562). We do not agree with Petitioners that *International Brotherhood* "is directly on point and controlling." As we have described, the reason that the Port District issued the RFP and entered into the Lease was to obtain construction of a hotel on the Property. In contrast, the construction of the oil drilling equipment in *International Brotherhood* was collateral to the city's purpose of extracting oil and gas.

We are also not persuaded by the decision in *Greystone Homes, Inc. v. Cake* (2005) 135 Cal.App.4th 1 [37 Cal.Rptr.3d 183], which Petitioners rely on to argue that a project constitutes "[c]onstruction . . . done under contract" only if the public funds pay for actual construction rather than reducing the cost of the construction project. *Greystone* was decided under the version of section 1720 in effect prior to Senate Bill No. 975 (2001–2002 Reg. Sess.). (135 Cal.App.4th at p. 7 ["The parties agree that this case is governed by former section 1720[, subd. ](a)."].) In *Greystone*, a redevelopment agency conveyed land on which a developer built townhomes, and the agency provided subsidies by conveying one of the real property parcels used for the project, paying a traffic mitigation fee and reimbursing the developer for property acquisition costs. (*Id.* at p. 11.) *Greystone* framed the issue as whether any of the subsidies provided by the agency were "a payment for actual construction" (*ibid.*), and concluded that they were not because (1) the real property was incorporated into the project, instead of being used to pay for it; (2) the traffic mitigation fees were "incurred as a consequence of the construction" rather than a cost of construction; and (3) the reimbursement money was earmarked for land acquisition instead and not construction costs (*id.* at pp. 11, 13). *Greystone*'s focus on the payment of "actual construction" costs by the public agency is misplaced following the amendments to section 1720 made by Senate Bill No. 975. As we have explained, requiring the payment of public funds to be applied to the actual costs of construction would nullify many of the types of payments of public funds identified in section 1720, subdivision (b). We thus reject *Greystone*'s approach in light of the current text of section 1720.

Finally, Petitioners point to our Supreme Court's decision in *City of Long Beach, supra*, 34 Cal.4th 942. In that case, our Supreme Court applied a

version of section 1720 in effect prior to Senate Bill No. 975 (2001–2002 Reg. Sess.), and prior to an earlier amendment broadening the definition of "[c]onstruction" in section 1720, subdivision (a) to include design and preconstruction phases of construction. (*City of Long Beach*, at p. 948.) In addressing the question of whether the city's partial funding of preconstruction expenses of a private animal control facility rendered the project a public work, our Supreme Court concluded that the public funds had not paid for "construction" because preconstruction phases were not covered by the definition of "construction" in the applicable version of the statute. (*Id.* at pp. 950–954.) *City of Long Beach* addressed a completely different issue regarding the definition of "construction" than that presented here; there is no issue regarding preconstruction in this case. Further, *City of Long Beach* expressly declined to address the issue of whether the project was " 'done under contract.' " (*Id.* at p. 954.) Therefore, we find nothing in our Supreme Court's discussion in *City of Long Beach* to support Petitioners' contention that the Project at issue here was not "[c]onstruction . . . done under contract."

We note also that the contractual relationship between the Port District and OPB is very similar to the contractual relationship between the parties in *McIntosh, supra*, 14 Cal.App.4th 1576. In *McIntosh*, the county entered into a sublease with a nonprofit corporation to build and operate a residential care facility on the property, and the corporation agreed to pay fair market rent to the county, which was waived for the first 20 years. (*Id.* at p. 1580.) The corporation then contracted with a general contractor to build the structure. (*Id.* at p. 1581.) If one of the Legislature's purposes in enacting Senate Bill No. 975 (2001–2002 Reg. Sess.) was to abrogate *McIntosh*'s holding that the project in that case was not a public work (see *State Building, supra*, 162 Cal.App.4th at p. 307), it makes no sense to interpret the phrase "[c]onstruction . . . done under contract" to preclude a lease from ever constituting a contract for construction. If that were the case, the project in *McIntosh* would not constitute a public work even after the amendments made by Senate Bill No. 975.

For all of these reasons, we reject Petitioners' contention that the Project was not "[c]onstruction . . . done under contract" within the meaning of section 1720, subdivision (a)(1). Instead, we conclude, as advocated by CCCC, that the terms of the Lease—which required a hotel to be built on the Property—satisfied the statutory requirement.

2. *Construction Was Paid for in Whole or in Part out of Public Funds*

The second issue is whether the Project is a public work in that construction was " 'paid for in whole or in part out of public funds.' " (§ 1720,

subd. (b).) CCCC contends it was; petitioners contend it was not. The issue is a question of law, based on undisputed facts, to which we apply a de novo standard of review. (*Azusa Land Partners, supra,* 191 Cal.App.4th at p. 14.)

As we have described, section 1720, subdivision (b)(4) defines " 'paid for in whole or in part out of public funds' " to mean, among other things, "rents . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision."

CCCC argues that the rent credit provided for in the Lease constituted a reduction in rent within the meaning of section 1720, subdivision (b)(4). According to CCCC, we need only look to the plain terms of the Lease to conclude that the Port District agreed to a reduction of rent. CCCC points to the terms of the Lease, which obligate OPB to pay a minimum annual rent for the first 20 years of the Lease, and a total annual rent according to a schedule of percentage rents for the income generated by the hotel. As CCCC points out, the Lease provides that the Port District is providing a monthly rent credit to be applied to the rent due each month through 2016 or until the amount of $46.5 million in rent credit is reached, whichever occurs first.

CCCC also argues that aside from being apparent from the terms of the Lease that the Port District granted a reduction of rent to OPB, the parties' negotiating history confirms that the parties viewed the rent credit as a reduction in the compensation that the Port District would otherwise be entitled to for leasing out the Property. As we have explained, the genesis of the $46.5 million rent credit was a request by HSDCC early in the parties' negotiations for a subsidy of $26.5 million to be paid by the Port District. The parties eventually negotiated a deal with this subsidy taking the form of a rent credit of $46.5 million to be paid over a number of years, which would equal approximately $26.5 million at present value.

In assessing CCCC's argument, we note that no case law exists interpreting the phrase "rents . . . that are . . . reduced, . . . waived, or forgiven" in section 1720, subdivision (b)(4). However, when interpreting a statute, " ' "[t]he words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.' " (*People v. King* (2006) 38 Cal.4th 617, 622 [42 Cal.Rptr.3d 743, 133 P.3d 636].) Here, we agree with CCCC that the phrase "rents . . . that are . . . reduced" has a plain everyday meaning that is clear and unambiguous. Under a plain commonsense meaning, rent is *reduced* when the amount of the rental obligation is set at a certain amount by agreement or by operation of law, and a discount is given from that amount.

Under a plain commonsense meaning, rents are *waived or forgiven* when a party agrees not to impose or demand rents.

Applying this plain commonsense meaning, we agree with CCCC that rents were reduced, waived or forgiven by the Port District. The Lease sets forth a monthly and minimum annual rent amount that OPB is obligated to pay to the Port District. The rent credit constitutes a *reduction* in that payment obligation. In addition, the 100 percent rent credit during the first 34 to 36 months of the Lease is not only a *reduction*, but also could be considered a *waiver* of the rent because no rent at all is due in that period.[15]

██ Petitioners' position is that the phrase "rents . . . that are . . . reduced, . . . waived, or forgiven" (§ 1720, subd. (b)(4)) has a more limited meaning and applies only when there is a *preexisting* contractual obligation to pay rent that is *later* reduced, waived or forgiven in a *subsequent* agreement. Petitioners argue that "at no time *prior* to signing the Lease was OPB ever obligated to pay any amount of rent to the Port [District]. . . . You cannot reduce, waive or forgive rent which is not yet owed." (Italics added, boldface omitted.) This argument is similar to the trial court's view that the rent credit did not constitute a reduction in rent because "there is no baseline against which to measure." We disagree. We find no indication in the statute that a *preexisting* legal contract to pay rent must exist before a public agency can agree to a reduction or waiver of rent within the meaning of section 1720, subdivision (b)(4). In this case, *the Lease itself* establishes OPB's agreement to pay certain baseline rent amounts, consisting of the minimum annual rent and the schedule of percentage rents. The Lease obligates OPB to pay those rents in the absence of any applicable rent credit, stating that the rent *"shall"* be based on the minimum annual rent and the percentage rents which are detailed in the Lease. The rent credit therefore constitutes a reduction in the rent from the baseline set forth in the Lease.[16]

---

[15] Although CCCC advocates that we examine the parties' negotiating history to determine whether the Port District agreed to a reduction in rent, because the terms of the Lease set forth a clear baseline rent, from which OPB is granted a reduction, we need not look to the parties' negotiating history.

[16] At oral argument, counsel for Petitioners argued that although the Lease is structured to provide for a reduction from a baseline rent and refers to a "rent credit," those contractual provisions should not control because the Lease terms were "packaging by politicians" drafted by people "thinking in terms of politics and press conferences." Petitioners assert OPB was not afforded a reduction in rent because OPB's only obligation under the Lease was to pay a specific net amount of rent each year. This interpretation ignores the plain language of the Lease, and we reject it. As we have explained, the Port District gave OPB a reduction in rent within the meaning of the PWL because the Lease provides a baseline rent and a reduction from that rent in the form of a rent credit. There are legal consequences from the way a document is drafted and the plain meaning of the words that the parties choose to constitute their agreements. Petitioners are bound by those consequences in this case.

Petitioners also contend that in interpreting the phrase "rents . . . that are . . . reduced, . . . waived, or forgiven" we must incorporate the concept of fair market value. Specifically, Petitioners argue that we may not conclude that the Port District provided a *reduction* in rent within the meaning of section 1720, subdivision (b)(4) unless the total amount of the rent received by the Port District *over the total term of the Lease* is at less than fair market value.[17] We find no support for Petitioners' proposed approach in the text of section 1720, subdivision (b)(4). In fact, the opposite is the case. The statute refers, *in the alternative*, to "rents . . . that are paid, reduced, charged at less than fair market value, waived, *or* forgiven by the state or political subdivision." (*Ibid.*, italics added.) Therefore, a public agency may pay for construction out of public funds either by reducing rent *or* by charging rent at less than fair market value. There is no requirement that both conditions be present.

In a case such as this where the terms of the Lease plainly provide for a baseline rent that is reduced by a rent credit, Petitioners' proposed approach of focusing on the concept of fair market value over the entire term of the Lease is unnecessary and would greatly complicate the process of trying to determine whether a project is subject to the PWL. In the absence of *unanimous* expert opinion regarding the fair market value of the rent over the life of a lease, no one will be able to determine whether the PWL is applicable where a public agency provides a rent subsidy for a project. The Legislature's purpose in amending section 1720 to include a definition of "paid for in whole or in part out of public funds" was "to remove ambiguity regarding the definition of public subsidy of development projects." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 975 (2001–2002 Reg. Sess.) as amended Aug. 30, 2001, p. 5.) Where, as here, the terms of a controlling contract clearly provide a reduction in the stated rent, a requirement that the parties conduct a fair market rent analysis to confirm that there has been a reduction or waiver of rent would be counterproductive to that purpose because it would create uncertainty and would greatly complicate and add additional expense and litigation to the process of determining whether the PWL applies.

Petitioners also contend that the Lease does not provide for a reduction or waiver of rent because the Port District "did not give up any tangible economic asset when it agreed to the 'rent reduction.'" According to Petitioners, the rent credit provided in the Lease "could not be sold in the marketplace" and is simply the result of "the [Port District's] adjustment of

---

[17] As factual support, Petitioners rely on an appraisal report that they commissioned which concludes that although the rent credit in the first years of the Lease creates below-market rent for those periods, when looked at over the entire term of the Lease, the rent is at fair market value.

its initial lease rate starting point during negotiations." In Petitioners' view, *State Building, supra*, 162 Cal.App.4th 289, supports this argument. We disagree.

In *State Building, supra*, 162 Cal.App.4th 289, the issue was whether the provision of state low-income housing tax credits (LIHTC's) to fund a portion of a private developer's low-income housing redevelopment project meant that construction was paid for in whole or in part out of public funds within the meaning of section 1720, subdivision (a)(1). (162 Cal.App.4th at pp. 298, 302.) The principal issue was whether the LIHTC's constituted "[t]he payment of money or the equivalent of money by the state" (§ 1720, subd. (b)(1)) or a "[t]ransfer by the state . . . of an asset of value for less than fair market price" (§ 1720, subd. (b)(3)). (*State Building*, at pp. 310–311.) In concluding that neither of these statutory definitions applied, *State Building* accepted the argument that "[a] tax credit has no intrinsic value to the state. It is not sold by the state. It cannot be stolen from the state. And in allocating a tax credit, the state parts with nothing of any realizable monetary worth." (*Ibid.*) *State Building* also commented although the "LIHTC's 'are obviously an asset of value in some sense . . .' " the situation presented by the LIHTC's was "akin to the loss of rent faced by the county in *McIntosh*," in which the court focused on the fact that " '[t]he county's right to charge rent is not an available pecuniary resource like cash or some readily cash-convertible asset.' " (*Id.* at p. 317.) Based on this discussion in *State Building*, Petitioners contend that "the proper interpretation of [s]ection 1720[, subdivision ](b) is that the public agency must be transferring or giving up something of independent objective economic value." (Boldface omitted.)

■ We agree that *State Building*'s focus on whether the LIHTC's had a "realizable monetary worth" (*State Building, supra*, 162 Cal.App.4th at p. 311) was relevant to resolving the issues in that case of whether the LIHTC's constituted "[t]he payment of . . . the *equivalent of money*" (§ 1720, subd. (b)(1), italics added) or a "[t]ransfer . . . of *an asset of value* for less than fair market price" (§ 1720, subd. (b)(3), italics added). Indeed, both of those issues incorporate concepts of value and worth. But we need not conduct such an analysis in this case. The Legislature indicated by enacting section 1720, subdivision (b)(4) that *a reduction, waiver or forgiveness of rent* constitutes a payment of public funds, *regardless* of any further inquiry into whether the rent reduction has a realizable monetary worth. Thus, we need not undertake Petitioners' proposed inquiry into whether the Port District "g[a]ve up any tangible economic asset when it agreed to the 'rent reduction.' "

In sum, we reject Petitioners' proposed interpretations of the phrase "rents . . . that are paid, reduced, . . . waived, or forgiven" in section 1720,

subdivision (b)(4) in favor of the plain commonsense meaning we have set forth above, and that is advocated by CCCC. The rent credit provided in the Lease constitutes a reduction and waiver of rent within the plain meaning of the statute.[18]

We thus conclude that the Project was construction done under contract that was paid for in whole or in part out of public funds and constituted a public work covered by the PWL.

## DISPOSITION

We reverse the judgment and remand with directions for the trial court to recall the peremptory writ of mandate.

McIntyre, Acting P. J., and O'Rourke, J., concurred.

The petition of plaintiffs and respondents for review by the Supreme Court was denied October 12, 2011, S196157.

---

[18] Because we have concluded that the rent credit constitutes a reduction of rent within the meaning of section 1720, subdivision (b)(4), and that construction was therefore paid for in whole or in part out of public funds, we need not, and do not, consider CCCC's alternative argument that section 1720, subdivision (b)(4) applies because rent was "charged at less than fair market value."